STATE *ex rel.*

VONCEIL McLENDON

*v.*

BEN L. MORTON, *Chancellor,*

WEST VIRGINIA BOARD OF REGENTS,

*et al.*

(No. 14211)

Decided December 19, 1978.

*M. E. Mowery* for relator.

*Chauncey H. Browning*, Attorney General, *F. Layton Cottrill and Gregory W. Bailey*, Assistant Attorneys General, for respondents.

MILLER, JUSTICE:

Relator, Vonceil McLendon, an Assistant Professor at Parkersburg Community College, seeks this original writ of mandamus against the West Virginia Board of Regents and Ben L. Morton, its Chancellor. Her claim is based on the fact that she was denied a due process hearing in connection with the College's decision not to grant her tenure. We agree and issue the writ.

Relator bases her right to a due process hearing on the ground that the Board of Regents' tenure standards set out in its Amended Policy Bulletin No. 36 establish certain objective criteria which, if met, bestow a property interest sufficient to require that she be afforded a procedural due process hearing before tenure can be denied. The respondents, the Board of Regents and the Chancellor, deny that their tenure policy confers any property interest.

Tenure for teachers in State-supported colleges and universities is controlled by Amended Policy Bulletin No. 36 (herein Bulletin), effective July 1, 1974, entitled "Policy Regarding Academic Freedom and Responsibility, Appointment, Promotion, Tenure and Termination of Employment of Professional Personnel."

The authority of the Board of Regents to adopt the Bulletin is not questioned in this case. Notwithstanding any implication that may be found in *State ex rel. Kondos v. West Virginia Board of Regents*, 154 W. Va. 276, 175 S.E.2d 165 (1970), the broad language contained in W.Va. Code, 18-26-8, placing ". . . the general determination, control, supervision and management of the financial, business and educational policies and affairs of all state colleges and universities . . .", together with similar language found in W.Va. Code, 18-26-13(b), relating to community colleges, compels the conclusion that the Board of Regents is authorized to set standards for the hiring, tenure and dismissal of teachers at State colleges and universities. This power was explicitly recognized in

*Sheppard v. West Virginia Board of Regents,* 516 F.2d 826 (4th Cir. 1975).[1]

Section 8A of the Bulletin makes clear that tenure is intended to ensure academic freedom by protecting faculty members against capricious dismissal.[2] Tenure is not granted automatically, "but shall result from action by the West Virginia Board of Regents upon the recommendation of the president following consultation with the departments concerned."[3] Obviously, and as is the case here, tenure is considered first by the college. Parkersburg Community College implemented the Board's tenure policy by its own Policy Regulation No. 4P-36-03, which provides that "applications and/or nominations

[1] We acknowledged in *West Virginia Board of Regents v. Fairmont, Morgantown and Pittsburgh Railroad Co.,* 155 W. Va. 863, 189 S.E.2d 40 (1972), that by virtue of W.Va. Code, 18-26-1, *et seq.,* the public corporation known as the West Virginia Board of Regents was created and vested with general supervisory control over this State's institutions of higher education. Specifically, W.Va. Code, 18-26-12, transferred to the Board of Regents most of the powers and duties previously exercised by the West Virginia Board of Education over State colleges. This section contains several enumerated responsibilities pertaining to the education of teachers which are still vested in the West Virginia Board of Education, but these exceptions are not material to this case. It should be noted that W.Va. Code, 18-26-1 *et seq.,* does not contain all of the powers granted to the Board of Regents as, by virtue of W.Va. Code, 18-26-13, other provisions of Chapter 18 relating to higher education have been incorporated by reference into W.Va. Code, 18-26-1 *et seq.*

[2] "Tenure is a system designed to protect academic freedom and to provide professional stability for the experienced faculty member. It is a means of protection against the capricious dismissal of an individual who has served faithfully and well in the academic community. Continuous self-evaluation as well as periodic evaluation by peer and administrative personnel is essential to the viability of the tenure system. Tenure should never be permitted to mask irresponsibility, mediocrity, or deliberate refusal to meet academic requirements or professional responsibilities. Tenure applies to those faculty members who qualify for it and is a means of making the teaching and research profession attractive to persons of ability."

[3] "Tenure shall not be granted automatically but shall result from action by the West Virginia Board of Regents upon the recommendation of the president following consultation with the department concerned." [Section 8B, Amended Policy Bulletin]

for tenure shall be filed with the chairman of the College Wide Tenure Committee." The regulations also provide for an evaluation process.[4]

Of considerable significance is Section 8C of the Bulletin, which makes tenure available to all full-time employees who hold the rank of Assistant Professor or above.[5] Equally significant is Section 9C of the Bulletin, which sets forth the maximum time periods within which the tenure decision must be made by the institution: "The maximum period of probation shall not exceed seven years; and at the end of six years any non-tenured faculty member will be given notice in writing of tenure, or offered a one-year written terminal contract of employment...."[6]

---

[4] "All applications and/or nominations for tenure shall be filed with the chairman of the College Wide Tenure Committee. The chairman will forward the applications to the appropriate division chairman, who will give the applications to the divisional committee and the process of evaluation and recommendation shall then begin. Applications will be available on request from the chairman of the Faculty Assembly." [Policy Regulation No. 4P-36-03]

[5] "Tenure status may be attained by all full-time employees who hold faculty rank of Assistant Professor or above and whose major assignment is of an academic nature and shall not be contingent upon promotion in rank." [Section 8C, Amended Policy Bulletin]

[6] Section 9C continues:

"Any reduction in this period may be determined at the discretion of the president of each institution within the following guidelines:

"(1) A faculty member appointed to the rank of Instructor shall, if not elevated in rank, serve the maximum seven-year probationary period, and decision thereon shall be made at the end of the sixth year.

"(2) An Assistant Professor may be eligible for consideration for tenure at the end of three years in that rank and at that institution.

"(3) An Associate Professor or Professor may be eligible for consideration for tenure at the end of two years in these ranks and at that institution."

In her petition, Professor McLendon does not appear to contend that as an Assistant Professor she needed only three years in that rank to be eligible for tenure. She asserts six years of service without disclosing how long she has held the rank of Assistant Professor.

These are the relevant provisions in regard to eligibility for tenure. It is clear from Section 11 of the Bulletin that once tenure is obtained, a faculty member cannot be dismissed except for six specified reasons, and is entitled to formal hearing procedures with the right to appeal to the Board of Regents. These procedural rights do not apply to a non-tenured teacher unless he is dismissed during the term of his annual contract.[7]

# I
## THE NATURE OF THE INTEREST

Both parties agree that the question of whether Professor McLendon is entitled to any procedural due process upon rejection of her application for tenure must be answered by determining whether she has some protected interest created by Amended Policy Bulletin No. 36.

We are cited *Board of Regents v. Roth,* 408 U.S. 564, 33 L. Ed. 2d 548, 92 S.Ct. 2701 (1972); *Perry v. Sindermann,* 408 U.S. 593, 33 L. Ed. 2d 570, 92 S.Ct. 2694 (1972); and our own cases of *Waite v. Civil Service Commission,* ____ W. Va. ____, 241 S.E.2d 164 (1977), and *North v. West Virginia Board of Regents,* ____ W. Va. ____, 233 S.E.2d 411 (1977), as establishing the guidelines for determining a protected interest.

Each of these cases announces the rule that a protected interest, in the sense that its withdrawal requires some procedural due process protection, can be either a liberty or property interest. Admittedly, no claim of a liberty interest is at stake in this case, as Professor

---

[7] Section 9G of the Bulletin provides in pertinent part:

"During the probationary period contracts will be issued on a year-to-year basis and appointments may be terminated with or without cause at the end of any contract year. During such probationary period no reason for non-retention or nonreappointment need be given...."

Section 11A, which sets out the right to a hearing, provides in part:

"The dismissal of a faculty member with tenure, or of any faculty member before the end of a specified period of appointment, shall be effected only pursuant to the procedures provided in these policies, ..."

McLendon does not assert that the denial of her tenure arose out of her exercise of some constitutionally protected right, such as freedom of speech, or that the denial was based upon some charge which involved her reputation, honor or integrity.

The issue thus narrows to whether she had some property interest by virtue of the Bulletin and the regulations surrounding tenure. We acknowledged in *Waite* that *Roth* formulated a property interest broader than the traditional concept of real and personal property:

> "It is clear from the Supreme Court decision in *Roth, supra,* that the Constitution protects property interests beyond the traditional concept of real or personal property. The Court indicated that a benefit which merits protection as a property interest must be one to which there is more than a 'unilateral expectation.' 408 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at understandings which allow the claimant's expectations to be characterized as 'a legitimate claim of entitlement to [the benefit].' *Ibid.*" [___ W. Va. at ___, 241 S.E.2d at 168]

We also recognized in *Waite* that our analysis of liberty and property interests was hinged to our constitutional due process standard, West Virginia Constitution, Article III, Section 10. Consequently, while we may utilize the teachings of the United States Supreme Court in its due process cases, we are not constrained by identicality so long as we do not diminish our State standard below the federal standard. *Oregon v. Hass,* 420 U.S. 714, 43 L. Ed. 2d 570, 95 S.Ct. 1215 (1975).

We find no United States Supreme Court case involving tenure which is precisely in point with the present case. *Roth* involved an assistant professor who had been hired at Wisconsin State University on a one-year contract which was not renewed at the end of the year. Wisconsin had a statute which gave tenure after four years of continuous service. The Court found Roth not to have any property interest since he had not met the tenure standard.

In *Perry,* the professor had been employed for four years at Odessa Junior College and had two years' previous college teaching experience. He claimed that the college had a *de facto* tenure program under which he qualified. The Court agreed this would be a sufficient property interest to require a procedural due process hearing for determination of reasons for his non-retention. The case was remanded to permit the professor to prove the facts surrounding his eligibility under the *de facto* tenure system, in order to establish his property interest.

A precise line cannot be drawn around the concepts of property and liberty interests, since these terms expand with society's enlightened values. Within the term "property interest," courts have had less difficulty in requiring procedural due process protection where existing rights are terminated or diminished by governmental action. *See, e.g., Bell v. Burson,* 402 U.S. 535, 29 L. Ed. 2d 90, 91 S.Ct. 1586 (1971) (driver's license suspended); *Goldberg v. Kelly,* 397 U.S. 254, 25 L. Ed. 2d 287, 90 S.Ct. 1011 (1970) (welfare benefits terminated). The more difficult question, as reflected in *Roth* and *Perry,* arises in determining whether the property interest is in the nature of a unilateral expectancy or the more secure status of an entitlement.

As noted above, *Roth* and *Waite* recognized that existing rules or understandings between the institution and the individual could give rise to a legitimate claim of entitlement. *Perry* teaches that they need not be written, but can evolve in a *de facto* fashion—a position followed by other courts in tenure cases. *See, e.g., Soni v. Board of Trustees,* 513 F.2d 347 (6th Cir. 1975), *cert. denied,* 426 U.S. 919, 49 L. Ed. 2d 372, 96 S.Ct. 2623 (1976); *Zimmerer v. Spencer,* 485 F.2d 176 (5th Cir. 1973). We do not consider *Sheppard v. West Virginia Board of Regents,* 516 F.2d 826 (4th Cir. 1975), to be contrary to these concepts. *Sheppard* concluded that under the Board's tenure policy then in effect, a teacher who had less than five years' teaching time had not met this

eligibility standard and therefore had no entitlement to tenure.

Other courts have found entitlements based on statutory language. *Pence v. Kleppe*, 529 F.2d 135 (9th Cir. 1976), involved a statute authorizing the United States Secretary of the Interior to allocate up to 160 acres of unreserved federal land in Alaska to natives who had occupied the land for a period of five years. The district court held that the broad discretion vested in the Secretary under the statute prevented any judicial review of his decision. On appeal, the court concluded that the statutory language setting eligibility by residency gave the native Alaskan the right to have a procedural due process hearing to prove his qualifying acts before the Secretary could finally reject his claim. *See also Coomes v. Adkinson*, 414 F. Supp. 975 (D. S.D. 1976).

In *Geneva Towers Tenants Organization v. Federal Mortgage Investors*, 504 F.2d 483 (9th Cir. 1974), the court sustained tenants of a federal low rent housing project in their asserted right to a procedural due process hearing before their rent could be raised. This was upon the theory that the governing federal statute created a sufficient entitlement to the rent level already established. An opposite result was reached in the earlier case of *Hahn v. Gottlieb*, 430 F.2d 1243 (1st Cir. 1970). A result somewhat similar to that in *Geneva Towers* was reached in *Caramico v. Secretary of HUD*, 509 F.2d 694 (2nd Cir. 1974), where the court held that low rent tenants had a sufficient statutory entitlement to a due process hearing where they might challenge the decision of the Federal Housing Administration effecting their eviction from a building upon default of the mortgage payments. *See generally* Note, *Statutory Entitlement and the Concept of Property*, 86 Yale L.J. 695 (1977).

While not precisely analogous, *Willner v. Committee on Character and Fitness*, 373 U.S. 96, 10 L. Ed. 2d 224, 83 S.Ct. 1175 (1963), held that the state could not exclude any qualified person from the practice at law and, by dictum, any other occupation without a procedural due

process hearing. While the terminology of property entitlement was not used, it is clear that the Court's concern was the denial of a valuable right without hearing when the applicant alleged he had met the applicable eligibility standards. *Willner* relied upon *Goldsmith v. United States Board of Tax Appeals*, 270 U.S. 117, 70 L. Ed. 494, 46 S.Ct. 215 (1926), where a due process hearing was mandated for an attorney who claimed he was qualified to practice before the Board but had been rejected without reasons or hearing. It is not without significance that *Roth* cites *Goldsmith* and states its principle as follows:

> "Although this court disposed of the case on other grounds, it stated, in an opinion by Mr. Chief Justice Taft, that the existence of the Board's eligibility rules gave the petitioner an interest and claim to practice before the Board to which procedural due process requirements applied. . . ." [408 U.S. at 576 n. 15, 33 L. Ed. 2d at 560, 92 S.Ct. at 2709]

These are not the only cases where due process has been mandated upon the denial of an application for state-derived benefits based on a claim of eligibility. *Freitag v. Carter*, 489 F.2d 1377 (7th Cir. 1973) (application for taxicab driver's license); *Raper v. Lucey*, 488 F.2d 748 (1st Cir. 1973) (application for driver's license); *Hornsby v. Allen* 326 F.2d 605 (5th Cir. 1964) (application for liquor license); *Davis v. United States*, 415 F. Supp. 1086 (D. Kan. 1976) (application for injury benefits); *Baker-Chaput v. Cammett*, 406 F. Supp. 1134 (D. N.H. 1976); *Alexander v. Silverman*, 356 F. Supp. 1179 (E.D. Wis. 1973) (application for welfare benefits); *see generally* Note, *The Rejected Applicant for General Assistance and His Right to a Review*, 25 Hastings L.J. 678 (1974).

Chief Justice Caplan addressed a similar problem in our leading case of *State ex rel. Bronaugh v. City of Parkersburg*, 148 W. Va. 568, 136 S.E.2d 783 (1964), where a licensed physician claimed he had complied with the regulations regarding staff admission to a city-owned hospital and was

denied admission without being given reasons or a hearing. We held that he was entitled to both. The opinion makes clear that the physician had a property interest, the right to practice fully his profession. 148 W. Va. at 575, 136 S.E.2d at 787.[8] The Fifth Circuit has recognized the existence of a property interest in this situation. *Shaw v. Hospital Authority*, 507 F.2d 625 (5th Cir. 1975).

On several occasions this Court has entertained mandamus to require the granting of an application where the applicant met the eligibility standards. Although the rationale of a property entitlement was not used, it is clear that this basic substantive principle was involved. *Beverly Grill, Inc. v. Crow*, 133 W. Va. 214, 57 S.E.2d 244 (1949) (application for beer license); *State ex rel. Hoffman v. Town of Clendenin*, 92 W. Va. 618, 115 S.E. 583 (1923) (pool hall license). These cases focused on the arbitrary and capricious nature of the actions of the public official,

---

[8] *Bronaugh* involved a mandamus and was predicated on the theory that the petitioner had a legal right to a hearing and that the hospital's refusal to grant a hearing was arbitrary and capricious, thus controllable by mandamus:

"It is generally accepted that mandamus may not be employed to compel an administrative officer to perform a particular act which he has refused to do, where his action depends upon the exercise of judgment or discretion on his part. However, when his refusal is arbitrary or capricious or is based upon no substantial reason, mandamus will lie. *Backus v. Abbot*, 136 W. Va. 891, 69 S.E.2d 48; *Beverly Grill, Inc. v. Crow*, 133 W. Va. 214, 57 S.E.2d 244; *State ex rel. Dillon v. Neal*, 104 W. Va. 259, 139 S.E. 757; *State ex rel. Noyes v. Lane*, 89 W. Va. 744, 110 S.E. 180; 12 M.J., Mandamus, Section 6." [148 W. Va. at 574, 136 S.E.2d at 787]

The State in the present case argues that the mandamus should be dismissed, as Professor McLendon should pursue a civil rights action under 42 U.S.C. § 1983. A counter argument was made and rejected in *Freitag v. Carter*, 489 F.2d 1377, 1380-81 (7th Cir. 1973), where the defendant urged dismissal of a § 1983 action on the ground that the plaintiff could pursue a state mandamus remedy. The court, in rejecting this contention, recognized that alternative remedies were available in the federal-state system. We accept this view and hold that the availability of a federal remedy is irrelevant here.

which is nothing more than an alternative way of finding a lack of procedural due process.

In considering the tenure program of Parkersburg Community College, along with the Board of Regents' policy on tenure, it is clear that the sixth year of a teacher's employment marks the critical time. The decision on tenure must be made by the end of that year. The College's policy regulations provide the right to apply for tenure and establish a detailed evaluation and review procedure with fixed time periods for action. The regulations require a recommendation by the College Wide Tenure Committee to the President by November 20.[9] This time period obviously integrates with the Board of Regents' requirement for timely notice to teachers of their non-retention.[10]

On the basis of these regulations, Professor McLendon, a full-time employee with the rank of Assistant Professor in her sixth teaching year, filed for tenure. The application was processed by the tenure committee and culminated with a letter from the President of the College denying tenure. The letter gave no reasons for the denial of tenure and she was offered a one-year termination contract.[11]

---

[9] Parkersburg Community College, Policy No. 4P-36-03, page 6.

[10] Amended Policy Bulletin No. 36, Subsection 9H:

"The president of each college or university shall give written notice to non-tenured faculty concerning their retention or non-retention as follows:

"(1) Not later than March 1 of the first academic year of service.

"(2) Not later than December 15 of the second academic year of service.

"(3) At least one year before the expiration of an appointment after two or more years of service in the institution."

[11] Relator advances the argument that certain deadlines for interdepartmental recommendations as provided in the College regulations were not met. However, these lapses have no ultimate bearing on relator's right to a due process hearing, since under the regulations at no stage in the proceedings at the College does a non-tenured teacher have a right to participate directly in the evaluation process. *Powell v. Brown*, ____ W. Va. ____, 238 S.E.2d 220 (1977), cited by relator, has no applicability, since it involved a

We conclude that Professor McLendon had more than a unilateral expectation of tenure. With her rank of Assistant Professor, six years of teaching service and full-time employment in academic teaching, she met the eligibility criteria to make application for tenure. This does not mean, however, that she was automatically entitled to obtain tenure status. Both the Board's Bulletin and the College's regulations indicate that teaching competency is a further criterion for obtaining tenure. Competency involves an evaluation of a teacher's total professional skills. It is the basic substantive issue once the objective eligibility requirements are met.

However, satisfying the objective eligibility standards for tenure gave Professor McLendon a sufficient entitlement so that she could not be denied tenure on the issue of her competency without some procedural due process.

## II
## THE DEGREE OF PROTECTION AFFORDED

Syllabus Point 5 of *Waite v. Civil Service Commission*, ___ W. Va. ___, 241 S.E.2d 164 (1977), enunciates the following standards for considering the extent of due process protection afforded where a property interest is sought to be deprived:

"The extent of due process protection affordable for a property interest requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of a property interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

written administrative grievance procedure where the involved party was not given a hearing as provided for in the administrative regulations.

*Waite* involved a temporary suspension of a civil service classified employee and acknowledged the more general rule for due process protection set forth in *North v. West Virginia Board of Regents,* ___ W. Va. ___, 233 S.E.2d 411 (1977), where, in the pertinent part of Syllabus Point 2, we stated:

> "First, the more valuable the right sought to be deprived, the more safeguards will be interposed. Second, due process must generally be given before the deprivation occurs unless a compelling public policy dictates otherwise. Third, a temporary deprivation of rights may not require as large a measure of procedural due process protection as a permanent deprivation."

*North* dealt with the expulsion of a fourth-year medical student and relied in part on the procedural due process analysis in *Goss v. Lopez,* 419 U.S. 565, 42 L. Ed. 2d 725, 95 S.Ct. 729 (1975), which involved a suspension of up to ten days of public high school students.

If we apply the *Waite* formulation here, it is apparent that the private interest affected is of considerable importance to the teacher. Tenure once acquired is a substantial right. It ensures that the teacher cannot be dismissed except for the defined reasons which are set out in the Bulletin and then not until a full due process hearing has been held. The Board Bulletin recognizes tenure is inextricably tied to academic freedom. We cannot blind ourselves to the fact that tenure is a paramount professional and economic goal for a teacher. Thus, it is a valuable property interest.

Under the second standard, there are currently no orderly procedures or protections that exist for one who meets the objective standards for tenure eligibility but is denied tenure. The risk of erroneous or capricious denial of tenure is apparent in light of the lack of any safeguards that would diminish this margin of error.

The final factor is the state interest in avoiding the increased fiscal and administrative burden resulting from procedural due process requirements. A state col-

lege or university has a substantial interest in determining that only competent and dedicated teachers are afforded the security of tenure, but this interest is not diminished by affording some procedural due process after the decision to deny tenure has been made.

Prior to a teacher reaching tenure eligibility status, a state college can decide not to renew the annual teaching contract and thereby terminate the teacher without the necessity of any reasons or hearing.[12] We cannot help but assume that after several years with the college, a teacher's qualifications and merits would be well known to the administration so that it could sever the incompetent teacher prior to his obtaining tenure eligibility.

While we recognize that a procedural due process hearing may entail some additional burden to the college, we cannot measure the quality of due process solely by the economic burden it may impose.

We also recognize that the determination of a teacher's qualifications is not limited to a narrow inquiry into his academic credentials, but encompasses a wide spectrum of qualities, not all of which may have the same significance. There is obviously a need to permit a latitude of discretion as the issue cannot be framed with mathematical precision or exactitude. What should not be tolerated is a wholly arbitrary and capricious selection process where the competent are turned aside in favor of those less qualified.

We conclude that minimal procedural due process necessitates a notice of the reasons why tenure is not extended and a hearing with an opportunity to submit evidence relevant to the issues raised in the notice. The hearing tribunal should be unbiased. If the teacher demonstrates that the reasons are wholly inadequate or without a factual basis, the administration would be re-

---

[12] This presupposes that the termination does not involve a violation of his liberty interests. *Connell v. Higginbotham*, 403 U.S. 207, 29 L. Ed. 2d 418, 91 S.Ct. 1772 (1971); *Keyishian v. Board of Regents*, 385 U.S. 589, 17 L. Ed. 2d 629, 87 S.Ct. 675 (1967).

quired to show the contrary. *See Board of Regents v. Roth*, 408 U.S. at 585-86, 33 L. Ed. 2d at 165-66, 92 S.Ct. at 2713 (Douglas, J., dissenting). Because academic personnel are involved, we do not believe that the right to retained counsel at the hearing is obligatory unless the parties agree.[13]

The factual issues at such hearing fall into two categories. First, whether the objective eligibility standards of full-time teaching employment, rank and time in service have been met.[14] The second is whether the adverse decision with respect to her teaching competency was arbitrary and capricious or lacked any factual basis.

For the foregoing reasons, a writ of mandamus is awarded compelling the respondents to grant the relator a hearing in accordance with the principles set forth herein.

*Writ awarded.*

---

[13] We note that under Section 9G of the Bulletin, the Board of Regents does review the decision of non-retention:

"An appeal from the president's decision as to non-retention may be made by the non-tenured faculty member to the Board of Regents, which will review the decision of the president to determine whether the same has afforded procedural due process and was not in violation of the constitutional rights of the non-tenured faculty member."

This review should follow the hearing now mandated by this case.

[14] The respondents do not appear to question that these standards have been met in this case.