400 S.E.2d 213

**Larry BROWN**

v.

**WOOD COUNTY BOARD OF EDUCATION.**

**No. 19364.**

Supreme Court of Appeals of West Virginia.

Nov. 30, 1990.

Charles R. Garten, Charleston, for Larry Brown.

Howard E. Seufer, Jr., Davis, Bailey, Pfalzgraf & Hall, Parkersburg, for Wood County BOE.

WORKMAN, Justice:

Larry Brown appeals from a Circuit Court of Kanawha County order which affirmed the West Virginia Education Employee's Grievance Board's ("Grievance Board") denial of appellant's grievance. In his grievance, appellant alleged that the utilization of "grade distribution" as an indicator of teacher performance violates state and county board of education policies. Appellant also challenged the right of the Wood County Board of Education ("Board") to require that an improvement plan be prepared and implemented in connection with his "grade distribution" problem. After reviewing the policies pertinent to these issues, we conclude that the circuit court properly ruled that the Board did not violate any provisions of state or local policy by using "grade distribution" as an indicator of teacher performance or by establishing an improvement plan for Mr. Brown. We disagree, however, with the circuit court's affirmance of the Grievance Board's finding that referral to an improvement team was an appropriate remediation measure. Accordingly, we affirm the decision of the circuit court in part and reverse the decision in part.

Appellant is employed by the Board and at all times relevant to this case taught eighth-grade earth science to five Level II (average) classes and one Level III (lower level, but not remedial) class at Blennerhasset Junior High School. On a final evaluation for the 1985–86 school year, which was dated May 28, 1986, Mr. Brown received a "does not meet performance standards" ("DNMPS") in connection with the evaluation standard known as "Monitors Student Progress Toward Learning Outcome." Attached to the evaluation was an improvement plan which noted that appellant's distribution of grades was "out of skew" compared with grades given by other teachers at the same facility.

Appellant filed a grievance with the Board pursuant to the Education Employee's Grievance Act, W.Va.Code §§ 18–29–1 to –9 (1988 & Supp.1990), alleging a violation of state and county evaluation policies by use of "grade distribution" as an unfavorable indicator in connection with his evaluation. The grievance was heard and denied by appellant's principal at level I of the grievance process and then heard and denied by the Wood County Superintendent of Schools at level II. The Board waived

its participation in the grievance process at level III.[1] The grievance was again denied following an all-day level IV hearing before a hearing examiner of the West Virginia Education Employee's Grievance Board.[2]

Mr. Brown appealed the level IV decision to the Circuit Court of Kanawha County pursuant to W.Va.Code § 18–29–7 (1988) on grounds that the hearing examiner's decision was "contrary to law" and "clearly wrong." By order entered September 20, 1988, the circuit court ruled that "it is the opinion of this Court that the final decision of the Grievance Board in this case is not clearly wrong in view of the evidence on record, is not contrary to applicable Policies involved, and should be affirmed." In that same order the circuit court concluded that "[u]naccountable deviations in final grade distribution may be an indicator regarding such DNMPS status, especially when due notice is given to the adversely affected party." Through this appeal, Mr. Brown seeks a reversal of the circuit court's ruling as well as expungement of the DNMPS evaluation and improvement plan notation from his permanent record.

Before we proceed to resolve the issues presented by this case, it is necessary to identify relevant portions of state and county board of education policies which appellant contends were violated through the use of "grade distribution" as an indicator of his teaching performance. West Virginia Board of Education ("State Board") Policy 5300, which is referred to as the "open and honest" policy, provides that:

Every employee is entitled to know how well he/she is performing his/her job and should be offered the opportunity of an open and honest evaluation of his/her performance on a regular basis.... Every employee is entitled to the opportunity of improving his/her job performance prior to terminating or transferring of his/her services and can only do so with assistance of regular evaluation. It is recognized that every employee is entitled to due process in matters affecting his/her employment, transfer, demotion or promotion.

State Board Policy 5310 delineates responsibility between the state and county boards of education with respect to developing and implementing evaluation policy.

1. The state board has the responsibility to: a) develop standardized evaluation components to be used by the respective counties in developing their evaluation policies and administrative procedures; and b) approve county board of education staff evaluation policies.

2. Each county board of education has the responsibility to: (a) develop and implement a staff evaluation policy; and (b) to implement written administrative procedures related to the components of the county's staff evaluation policy. In developing its evaluation system, a county board of education may include additional components and processes as determined by local needs and priorities.

In State Board Policy 5311, the State Board has identified the following seven

---

1. *See* W.Va.Code § 18–29–4(c) (1988).

2. The circuit court's final order indicates that the following conclusions of law were made by the hearing examiner at the level IV hearing:
1. That pursuant to State Board Policy 5310, § D(7)(d)(1) & (2), referral to an improvement team may occur whenever immediate supervisor cannot provide improvement ...;
2. That pursuant to Wood County Policy 4117(IV)(B)(6) and (C)(2), an improvement team with appropriate expertise may be appointed to assist employee in meeting job performance standards;
3. That Wood County Policy 5124 prohibits teacher from assigning predetermined amount of A's, B's, C's, D's or F's as final grades;

4. That Board of Education Policy 5311, § B(4)(a) permits inclusion of indicators "such as" teacher grading for review by evaluator;
5. That school officials are permitted latitude in evaluation of a teacher subject to the requirement that evaluation be open, honest and not arbitrary; and,
6. That State [or County] Education Administrative tribunals will not intrude into evaluations of teachers under State Board Policy 5300 unless there exists evidence of such arbitrary abuse of discretion on part of the school as to show primary purpose of evaluation policy has been confounded.

"performance standards" which county boards may include in their teacher evaluation and job description policy: knowledge of subject matter, classroom management, instructional skills, monitoring student progress, professional growth, pupil-teacher-parent relationships, and professional work habits. Policy 5311 suggests that the counties include indicators in conjunction with the performance standards to enable teachers to understand "performance expectations." To illustrate, the suggested indicators for the performance standard "monitoring student progress" are listed in Policy 5311 as: "a. Objective measures, such as grades, teacher-made or standardized test scores b. Subjective measures, such as professional opinion composite data c. Record system." Policy 5311 expressly prefaces the listing of illustrative indicators for each performance standard with the language "Indicators such as" and further explains that the local boards are not required to use the example indicators.

To comply with the obligations imposed by State Board Policies 5310 and 5311, the Board adopted two local policies, both of which went into effect prior to the 1985–86 school year. Board Policy 4117 is the local counterpart of State Board Policy 5310. It establishes a "standardized evaluation system" for all teaching and non-teaching employees and requires that the evaluation of any employee be based upon "performance standards" set forth in a job description. Policy 4117 further provides that indicators, which are defined as "an observable factor of a performance standard," may be specified for any employee provided "that [they] suggest improvement." This provision for an "employee-specific" indicator is coupled with the requirement that all employee evaluations be conducted openly.

"Openly" is defined by Policy 4117 to mean "that if the immediate supervisor (or designee) becomes aware of performance which indicates that an employee may not meet a performance standard, the immediate supervisor (or designee) shall inform the employee."

A second policy adopted to comply with State Board evaluation policies is Board Policy 4117.1. This policy resembles its counterpart, State Board Policy 5311, in that it outlines teacher responsibilities and performance standards. Policy 4117.1 enumerates the identical seven performance standards identified in State Board Policy 5311 and specifies indicators for each performance standard. As a prelude to the performance standards and indicators, Policy 4117.1 also states that: "The performance rating for each standard is to be determined by consideration of indicators such as those listed below each standard."

 The crux of appellant's argument is that the use of an indicator which is not expressly delineated within Board Policy 4117.1 violates the "open and honest" requirement established by State Board Policy 5300. Appellant reasons that because "grade distribution" is not expressly included as an indicator of the performance standard "monitors student progress toward learning outcomes" in Board Policy 4117.1,[3] his DNMPS evaluation was neither open nor honest. What appellant effectively ignores, however, is the fact that both the state and local policies expressly note that the list of indicators to be utilized in connection with evaluating the specified performance standards is not a definitive list. Board Policy 4117.1 prefaces the identification of the seven performance standards and accompanying indicators with the following notice: "The performance

---

3. Board policy 4117.1 delineates the following indicators of the performance standard "monitors student progress toward learning outcome:"

A. Is involved in the special program assessment process.
B. Adjusts instruction and expectations for students with special needs.
C. Collects sufficient data to determine grades.
D. Maintains accurate records of student progress.

E. Participates in school/county analysis of student performance.
F. Uses student records.
G. Uses individualized educational plans.
H. Provides feed-back to students to promote improvement.
I. Assesses and reports progress toward meeting approved learner outcomes to students.
J. Goes beyond normal expectations in

rating for each standard is to be determined by consideration of indicators *such as* those listed below each standard."[4] (emphasis supplied). Similarly, State Board Policy 5311 suggests exemplary indicators for each of the seven performance standards but introduces each list of suggested indicators with the language "Indicators such as." The argument suggested by appellant's reasoning is that any time a teacher is evaluated by using an indicator which is not expressly delineated in either the state or county policies, the evaluation per se is subject to challenge on the basis that it violates the "open and honest" requirements of State Board Policy 5300.

The "open and honest" requirement was applied by this Court in *Wilt v. Flanigan*, 170 W.Va. 385, 294 S.E.2d 189 (1982), a case in which the Berkeley County School Board's refusal to rehire a probationary teacher and to grant her a continuing contract of employment was reversed and remanded because her final evaluation was determined to be in violation of the "open and honest" policy statement. The *Flanigan* teacher received overall positive evaluations during her first two years of employment with only three noted areas of improvement following her first year and no areas of improvement following the completion of her second school-year. *Id.*, 170 W.Va. at 390, 294 S.E.2d at 194. During the fall of her third year, she was observed by the principal on two separate occasions in the classroom. Following the first observation, the teacher was determined to have "met or exceeded acceptable standards in 13 areas, failed to meet acceptable standards in 21 areas, was in between or average in 7 areas and was not observed in 2 areas." 170 W.Va. at 389, 294 S.E.2d at 192. Her review was "much better" in conjunction with the second of the fall observations. She was rated acceptable in 42 areas, not acceptable in 4, and one area was not observed. *Id.* After the second of two classroom observations conducted in the fall of her third teaching

year, we determined that the teacher "could reasonably have concluded that she actually was improving" based on the positive tenor of the second observation. 170 W.Va. at 391, 294 S.E.2d at 195.

Prior to the third in-class observation for her third year, the teacher requested a conference with the principal to discuss his practice of "sometimes listening into her classroom over the public address system and reprimanding the students over the speaker." 170 W.Va. at 389, 294 S.E.2d at 192. During this conference, the teacher was informed in response to her specific inquiry that the principal did not plan to recommend her for further employment and suggested that she might resign to avoid the embarrassment of being fired. *Id.* Instead of resigning, the teacher informed the principal that she intended to file a grievance concerning his adverse recommendation. 170 W.Va. at 389, 294 S.E.2d at 192.

On the date following this announcement, the principal conducted his third and final classroom observation of the *Flanigan* teacher. *Id.* Based on the three classroom evaluations, the *Flanigan* teacher received a final evaluation for her third year of probationary employment indicating that she needed improvement in eighteen areas. 170 W.Va. at 389, 294 S.E.2d at 193. This Court "conclude[d] that the third observation completed on February 13, 1980, and the negative annual evaluation completed the following day, were not the result of an open and fair evaluation of the appellant's performance as a teacher" because

1) the observation took place the day after the appellant had informed Greenfield [principal] that she was not going to resign and was going to file a grievance against him;

2) during the February 4, 1979 conference, it appeared that Greenfield had already decided not to recommend the appellant for reemployment;

3) the evaluation completed for the 1979–1980 school year dramatically increased the areas where the appellant

---

**4.** The level IV hearing examiner made an express finding of fact that "Principal Summers met with his staff at the beginning of the 1985–86 school term to discuss the new evaluation policy including indicators to be used and emphasiz[ed] 'such as' language for each standard." Testimony was offered to establish that appellant was in attendance at this meeting.

210

needed to improve from zero in the 1978–79 evaluation to 18 in the last evaluation; and

4) the third observation appears to have been more of a formality needed to comply with Berkeley County File GBI–R, rather than an open and fair observation.

170 W.Va. at 391, 294 S.E.2d at 195. We further determined that the *Flanigan* teacher was not given timely notice "that the administration did not feel she was doing an adequate job in disciplining and controlling her students...." *Id.*, 170 W.Va. at 390, 294 S.E.2d at 194.

■ An examination of both the manner in which the appellant was placed on notice regarding his skewed "grade distribution" and the period of time during which he was repeatedly advised regarding this problem demonstrates that Mr. Brown's evaluations, as contrasted to the *Flanigan* teacher's, undoubtedly fulfilled the "open and honest" requirements imposed by State Board Policy 5300. Although the specific focus of the underlying grievance is a written evaluation dated May 28, 1986, appellant acknowledged at the level IV hearing that the negative evaluation "came as no surprise" and that Principal Summers had discussed the "grade distribution" matter with him on "a number of prior occasions." The following chronology of the principal's actions bear witness to the fact that appellant received ample written notice regarding the issue which is the subject of the grievance.

At the end of the 1983–84 school year, Principal Summers wrote on appellant's evaluation, "I recommend that he evaluate his distribution of grades or difficulty of tests that govern his grade distribution, whichever is applicable." On appellant's evaluation for school year 1984–1985, Principal Summers wrote, "Once again I would recommend that Mr. Brown examine his grade distributions." During the school year in question (1985–86), the principal sent appellant a memorandum in November which noted that fifty percent of Mr. Brown's students had received D's or F's in science while the same students had a seventeen percent incident of D's and F's in other academic classes. This same memorandum advised appellant that Principal Summers "cannot understand why your grade distribution is skewed so far to the lower range" and warned that grade distribution was an indicator relating to as many as three performance standards and might result in a DNMPS on appellant's evaluation:

To relate this to our evaluation policy, I would judge that such a grade distribution would be an indicator of standards 2 and 4 [Monitors Student Progress Toward Learning Outcomes], and possibly standard 6. Such a distribution could cause me to mark one or all of the mentioned indicators DNMPS [Does Not Meet Performance Standards].

At the close of the memorandum, the Principal offered assistance to appellant to correct the grade distribution problem.

On February 6, 1986, Principal Summers again notified appellant through written memorandum that "I still have a real concern. You need to ask yourself what['s] wrong when 60% of your student[s] make or earn D['s] and F's." Finally, on the year-end written evaluation for the 1985–1986 school year, appellant received a DNMPS in the area of "monitors student progress toward learning outcomes." The evaluation contained an attachment which identified the "specific deficiency" as follows: "Mr. Brown's distribution of grades is out of skew (too low—about 50% D's and F's) in comparison with grades given by other teachers at BJHS [Blennerhasset Junior High School]."

■ The above chronology leaves no question that appellant was repeatedly and specifically advised regarding his distribution of grades. Based on his admitted notice regarding the grade problem, Mr. Brown does not stand in the shoes of the *Flanigan* teacher on the "open and honest" issue. We recognize that appellant's challenge of his evaluation on the grounds of openness and honesty stems not from his lack of notice regarding his grade distribution, but from his belief that he can only be evaluated by use of indicators which are expressly set forth in local policy

statements. Appellant's extrapolation that evaluation based on an indicator which is not expressly delineated in local policy must necessarily violate the "open and honest" requirement of State Board Policy 5300 is simply untenable. The *Flanigan* case illustrates that the aim of State Board Policy 5300 is to provide a teacher with timely notice "about the administration's views regarding her job performance, as reflected by the evaluations, observations, letters and conferences." 170 W.Va. at 390, 294 S.E.2d at 194.

■ The objective of imposing openness and honesty requirements in all decisions affecting a teacher's employment is to inject due process elements into such decisions by mandating regular notice of teacher performance coupled with an opportunity to improve such performance when necessary. These due process principles are not abrogated or even vitiated by use of an indicator that is not expressly associated with a given performance standard provided that the "employee-specific" indicator is disclosed to the teacher consistent with the policy mandate of openness and honesty. In other words, a local board of education may utilize indicators of a teacher's performance with respect to a given performance standard other than those indicators that are expressly delineated in local policy if the board promptly notifies the teacher of the use of any such "employee-specific" indicator and provides the teacher with an opportunity to improve before taking any employment action predicated on such indicator. Under these circumstances, the "open and honest" policy objectives have been fulfilled.

■ Our ruling in this case is buttressed by the fact that Board Policy 4117.1 makes it clear that the list of indicators for each performance standard is not exclusive or definitive by use of the language "indicators *such as* those listed below each standard." (emphasis supplied). It only stands to reason that the use of "employee-specific" indicators may be necessary on occasion. This need to utilize indicators which clearly relate to a respective performance standard, but are not expressly identified in the list of exemplary indicators arises from the fact that any list of indicators will not anticipate every indicia which reflect a specific teacher's need to improve his performance. As we recognized in *State ex rel. McLendon v. Morton*, 162 W.Va. 431, 249 S.E.2d 919 (1978), "[t]here is obviously a need to permit a latitude of discretion as the issue [evaluation of teacher's qualifications] cannot be framed with mathematical precision or exactitude." *Id.*, 162 W.Va. at 445, 249 S.E.2d at 926. As long as this "latitude of discretion" is subject to the requirement that the evaluation be open and honest, then the teacher will receive the minimal due process protection from arbitrary and capricious actions to which he is entitled. *See id.* Absent evidence of "arbitrary abuse of discretion," we will not intrude ourselves into the process of a teacher's evaluation. *See Higgins v. Board of Educ.*, 168 W.Va. 448, 286 S.E.2d 682 (1981) (recognizing that courts will not interfere in decisions concerning teacher transfer and promotion absent evidence of "arbitrary abuse of discretion").

■ A correlation must be demonstrated between the indicator and the applicable performance standard in connection with the use of "employee-specific" indicators of a teacher's performance. In this case, the following testimony was proffered by appellee's witness Principal Summers to explain what the performance standard "monitors student progress toward learning outcomes" entails:

> 'Monitoring student progress toward learning outcomes' means how a teacher approaches the monitoring of student progress. That includes grades, it includes reports, it includes how they handle that verbally with the students in immediate feedback—it includes all those things, but I think that grades and grade distribution is one of the ways.

To further establish the correlation, Principal Summers referenced the following four indicators provided in Board Policy 4117.1 pertaining to the subject performance standard: "B. Adjusts instruction and expectations for students with special needs. D. Maintains accurate records of student

progress. H. Provides feed-back to students to promote improvement. I. Assesses and reports progress toward meeting approved learner outcomes to students." Principal Summers explained how, in his opinion, each of these delineated indicators is similar in objective to the "such as" indicator referred to as "grade distribution."

Assistant Superintendent White further substantiated the correlation:

Q. My question is, assuming it is not one of the listed indicators, is it [grade distribution] an indicator such as the indicators under that performance standard and, if so, explain why you think it is?

A. I think it is a 'such as' the ones there. I think the kind of grades the teacher gives is an indication of the learning that is taking place. I don't think it is so important as to talk a whole lot about grades as it is to talk about the actual learning that takes place, the goals and objectives as set forth; but I would be concerned about whether or not kids would be learning what you would be expecting them to learn if you had a disproportional share of lower grades.

As Principal Summers opined:

I think that when students do not—when students receive poor grades, that they are not receiving praise, they are not receiving what they at least consider rewards for their efforts in classes; and when they feel that they do not receive a reward for an effort, then they put less effort into the class and that just continues from one grading period to the next grading period and so on.

We are satisfied by our review of the record that appellee adequately established a nexus between the "such as" indicator of "grade distribution" and the performance standard "monitors student progress toward learning outcome."

The only remaining issue in this case is appellant's objection to Principal Summer's recommendation that an improvement plan be implemented in connection with his DNMPS evaluation. Appellant does not challenge the authority of his principal to implement improvement plans. Appellant argues that because the DNMPS evaluation was in violation of State Board Policy 5300 given the use of an unspecified indicator, any improvement plan premised on such evaluation is necessarily improper. Based on our decision that the use of an "employee-specific" indicator does not violate State Board Policy 5300, we reject appellant's argument regarding the impropriety of implementing an improvement plan in connection with his DNMPS evaluation.

We do agree however with appellant's argument that the hearing examiner and circuit court incorrectly ruled that an improvement *team* may be appointed to assist appellant. Board Policy 4117(IV)(E)(5) provides that: "Only employees with an overall rating of 'does not meet performance standards' may be referred to an improvement team...." Since appellant had a DNMPS rating on only *one* performance standard as opposed to an overall DNMPS rating, both the hearing examiner and the circuit court were in error to suggest the use of an improvement team.

Based on the foregoing, we hereby affirm the decision of the circuit court in part and reverse the decision in part.

Affirmed in part; Reversed in part.