**Dr. Raj P. SONI**

v.

**BOARD OF TRUSTEES OF the UNIVERSITY OF TENNESSEE and Edward J. Boling.**

**Civ. A. No. 8378.**

United States District Court, E. D. Tennessee, N. D.

Feb. 21, 1974.

Charles D. Susano, Jr., Bernstein, Dougherty & Susano, Knoxville, Tenn., for plaintiff.

Ronald C. Leadbetter, John C. Baugh, Arthur B. Stowers, Jr., Daniel F. B. Rhea, Knoxville, Tenn., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

Plaintiff, Dr. Raj P. Soni, a former nontenured professor with the Department of Mathematics of the University of Tennessee, brought this action against the University claiming he was not accorded procedural due process under the Fourteenth Amendment when the University refused to renew his contract without sufficient notice of charges against him and without a sufficient hearing. Plaintiff's principal claim is premised on the companion cases of Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U. S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Jurisdiction is invoked under 28 U.S.C. §§ 1331, 1343(3).

In response to an increase in demand for mathematic professors in July 1967, defendant hired plaintiff as a visiting Associate Professor of Mathematics, such employment to commence in September 1967 and remain effective throughout the school year of 1967–1968. Prior to leaving the I.B.M. Corporation in September 1967 to join the Math Department, plaintiff's full time teaching experience at the college level included six years as an instructor in India and one year as an associate professor at Oregon State University.

In response to previous personal inquiries regarding the permanency of his job status with the University, and, pursuant to the recommendation of the former head of the Department, Dr. Donald J. Dessart, then Acting Head of the Department of Mathematics, on October 24, 1968 advised the appropriate faculty members that a special meeting would be held on October 29, 1968 to

consider approving plaintiff for a permanent appointment.[1]

Professor Shaffer, a tenured member of the Mathematics Department, testified that he attended the October 29 meeting but was advised by Dr. Dessart at that time that a vote on plaintiff's tenure would be inappropriate under the circumstances since plaintiff was then an alien and accordingly could not hold a permanent faculty position with the University.[2] Likewise, Professor Bradley, a tenured faculty member of the Department, who also attended the October 29 meeting stated that he was advised by Dr. Dessart that the committee could not formally vote on the question of tenure due to plaintiff's alien status.

Plaintiff testified that after the special meeting he was "congratulated" by those faculty members who had attended the meeting. Following the October 29 meeting, plaintiff received a letter from Dr. Dessart that stated it "was recommended that [he] be appointed an associate professor without tenure. . . . The question of recommending tenure will be considered by a similar departmental group at the time you become a citizen of the United States. In addition, it was recom-

mended that you receive the full benefits of participation in TIAA/CREF at the first reasonable opportunity. . . ."

The TIAA/CREF is a financial retirement program at the University that, according to the Faculty Handbook (p. 25) at that time, was restricted to "permanent type personnel."

As Dr. Dessart's October 29 letter was not in accord with the spirit of the earlier congratulations, plaintiff sought conference with Dr. Dessart, who advised him that the law precluded a grant of tenure but that his prospects with the University of Tennessee were good. Indeed, Dr. Dessart testified that had a vote been taken at the October 29 meeting he would have voted for granting plaintiff tenure.

Additionally, plaintiff further testified that thereafter in all other operative respects he was treated by his fellow faculty members as a tenured professor—a person with some permanency in the Department's future. In particular, plaintiff was invited and attended on two occasions the annual meetings of tenured faculty, where he was afforded the opportunity to participate in the discussions and vote on the tenure status of other mathematics professors.

1. Chapter IV of the University of Tennessee Faculty Handbook (1962), in effect at the time provided under the caption, "Periodic Consideration," in part that:

"In general, all recommendations for promotion or salary adjustments within a department are initiated by the department head . . . Normally, all such recommendations are made in conjunction with the preparation of the budget."

\* \* \* \* \*

"Final Decision

"Final decision on promotions or salary adjustments within rank will be made by the Board of Trustees."

More particularly, the administrative scheme is set forth at page 18, which provides that recommendations are made by the department head to the dean of the college. Subsequent to any hearing and advisement, the dean forwards his recommendation to the Academic Vice President, who, upon concurrence submits his recommendation to the President. After Presidential action, the Board of Trustees acts on the recommendation.

2. 49 Tenn.Code Ann. 1303 provides in part:

"It shall be *unlawful* for the trustees of the University of Tennessee . . . to employ any . . . teacher . . . to have in any way the custody and care of students of the public educational institutions of this state who is not a citizen of the United States of America; provided that nothing in this section shall be construed to prohibit arrangements whereby professors and teachers who are citizens of other nations may be employed on a temporary basis on the faculties of colleges, universities or public schools in Tennessee . . . " This state policy was effected at the faculty level at p. 15 of the faculty handbook: "Citizens of other countries may be employed in temporary positions only."

As the case under examination here is governed by the *Roth* and *Sindermann* guidelines, it is inappropriate at this time to make a dispositive finding on this statute's constitutionality.

Satisfied with his conversation with Dr. Dessart and the assurances of his fellow faculty members, together with other evidence of his permanency in the University community, plaintiff and his wife purchased a home in the Knoxville area. He continued to teach in the Department of Mathematics for the school years 1969–1970, 1970–1971, and 1971–1972. On December 15, 1971 he became a citizen of the United States. On March 8, 1973 plaintiff was summarily notified by letter that his appointment as an Associate Professor would be terminated as of August 31, 1973. Plaintiff was not afforded a hearing by any departmental or administraive committee, but was only advised in the termination letter that his performance as a teacher was not "of the quality we expect of our tenured staff." Plaintiff sought recourse through the appropriate administrative procedures, but, to date, has not been granted a due process hearing.

Against this factual background, the Court concludes that under *Roth* and *Perry*, there existed sufficient objective evidence to vest in plaintiff a cognizable property interest in the form of a reasonable expectation of future and continued employment. Defendant objectively acted toward plaintiff in such a manner as to reasonably lead him to believe that he was a person with a relative degree of permanency in the academic community of this University. Upon acquiring this property interest, it cannot be terminated without procedural due process.

■ The Court is mindful and appreciative of the guidelines set forth in *Roth* and *Perry* and the posture in which the Court made its rulings. Thus, it is generally accepted that a mere subjective expectancy of continued re-employment by a non-tenured teacher is not an interest protected. Rather, there is necessarily precedent to such a property interest a finding by the court that there exist sufficiently objective indicia to lead a non-tenured teacher to reasonably believe a degree of stability

had attached itself to his position. Under *Perry*, it is the responsibility of the Court to analyze the totality of circumstances surrounding the teacher's employment to determine whether the formal conduct of those around him provide a sufficient basis of objective expectancy of future employment. In seeking to define this property interest, the Supreme Court emphasized in *Perry* that traditional notions of property do not require rigid and formalistic tests. Rather, it recognized that the absence of tenure did not preclude a finding that the teacher has a "property" interest in re-employment if the acts and conduct of all the parties concerned lead to a mutually explicit understanding. 408 U.S. at 601.

"A teacher, like the respondent, who has held his position for a number of years, might be able to show from the circumstances of this service—and from other relevant facts—that he has a legitimate claim of entitlement to job tenure. Just as this Court has found there to be a 'common law of a particular industry or of a particular plant' that may supplement a collective-bargaining agreement (citation), so there may be an unwritten 'common law' in a particular university that certain employees shall have the equivalent of tenure."

408 U.S. at 602, 92 S.Ct. at 2700, 33 L.Ed.2d at 580.

■ If this Court is to eschew formalistic and technical tests in finding property interest then the mere presence of a formal tenure system, as is the case under examination here, should not be a dispositive distinction between *Perry* and the case before this Court. It is the opinion of the Court that under the circumstances here, plaintiff had a viable understanding that his employment would continue on a permanent basis with the Department of Mathematics, notwithstanding the statement contained in the October 29 correspondence that plaintiff's position was one without tenure. All the evidence and testimony re-

ceived by the Court points toward a mutual understanding of job permanency.

While the issues of the constitutionality of the Tennessee statute restricting tenure to United States citizens is not before the Court, plaintiff could have reasonably concluded that "but for" the statute's presence he would have been granted tenure in 1968. Additionally, plaintiff was treated as a tenured faculty member and such objective manifestations served as a reasonable basis for a mutual understanding between plaintiff and the University.

 Remaining, therefore, is the appropriate relief for plaintiff. In *Perry* the Court submitted that "[p]roof of such a property interest would not, of course, entitle him to reinstatement. But such proof would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency." 408 U.S. at 603. However, due process, an inherently illusive concept, requires the adoption of different procedures at different times. Plaintiff here should be afforded a statement of the charges against him, the names of witnesses who will appear on behalf of the University and the nature of their expected testimony, an opportunity for plaintiff to appear with an attorney, at a hearing before an appropriate tribunal that possesses some academic expertise, and answer and confront charges against him. It should be emphasized, however, that a fair and adequate hearing need not be conducted in a trial-like atmosphere.

As plaintiff's termination under the March 8 letter was without minimal due process and, therefore, wrongful, plaintiff is entitled to back pay from August 31, 1973 until the University completes a hearing complying with the above requirements. Davis v. Barr, 373 F.Supp. 740 (E.D.Tenn.1973); Zimmerer v. Spencer, 485 F.2d 176 (5th Cir. 1973).

As noted in *Perry*, the relationship between "a state institution and one of its teachers is essentially a matter of state concern and state law." [3] This Court does not sit in review of University procedures and in this opinion does not reflect either on the merits of plaintiff's capabilities and methodology as a teacher or the basis of the Department's nonretention of plaintiff. See generally, Lukac v. Acocks, 466 F.2d 577 (6th Cir. 1972); Hetrick v. Martin, 480 F.2d 705 (6th Cir. 1973); Harp v. Clemens, 464 F.2d 1029 (6th Cir. 1972); Poddar v. Youngstown State Univ., 480 F.2d 192 (6th Cir. 1973).

In conclusion, the parties will proceed in compliance with this memorandum and it is ordered that plaintiff receive all back pay from August 31, 1973 until the completion of an appropriate hearing.

---

3. 408 U.S. at 593 (C. J. Burger, concurring).