PAUL A. CLARKE

*v.*

WEST VIRGINIA BOARD OF REGENTS,
A CORPORATION CREATED BY STATUTE,
AND WENDELL G. HARDWAY, PRESIDENT
OF FAIRMONT STATE COLLEGE
(No. 14773)
Decided April 3, 1981.

*R. F. Gallagher and Samuel Spencer Stone* for appellant.

*Chauncey H. Browning,* Attorney General, and *Gregory W. Bailey,* Assistant Attorney General, for appellees.

McGRAW, JUSTICE:

This case comes before us upon appeal from a judgment of the Circuit Court of Kanawha County which affirmed a decision of the West Virginia Board of Regents upholding the dismissal of the appellant, Paul A. Clarke, from his tenured teaching position at Fairmont State College. Dr. Clarke was fired by the college's president, Wendell G. Hardway, effective May 29, 1978. A hearing examiner's report, completed almost one year later, confirmed the dismissal. Dr. Clarke claims that the dismissal procedures violated his constitutional right to due process. His primary assignments of error are that the notice of his dismissal was too vague to allow him to properly defend himself and that the hearing examiner's findings were too general to allow for effective review. He also questions the propriety of a post-deprivation hearing.

Denied relief by the West Virginia Board of Regents, Dr. Clarke filed a petition for a writ of certiorari in the Circuit Court of Kanawha County against both the Board and President Hardway to obtain a review of the procedures employed in effecting his dismissal. After reviewing the

dismissal procedures, the lower court denied the relief prayed for and affirmed the decision of the Board upholding the actions of President Hardway. It is from this adverse ruling that Dr. Clarke takes this appeal. We find merit in two of the appellant's due process contentions and reverse the lower court ruling.

Dr. Clarke was a tenured, full-time, professor of education at Fairmont State College. He taught there for three years, gained tenure, and continued teaching for eight more years. On March 22, 1978, President Hardway informed Dr. Clarke by letter that he would be fired at the end of the semester, May 29, 1978. The letter was sent in accordance with Policy Bulletin No. 36 of the West Virginia Board of Regents [hereinafter Bulletin]. The Bulletin provides that dismissal can be effected only for one or more of five grounds specifically enumerated therein.[1] President

---

[1] *Dismissal and Termination of Employment of Tenured Personnel*
A. Causes for Dismissal: The dismissal of a faculty member with tenure, or of any faculty member before the end of a specified period of appointment, shall be effected only pursuant to the procedures provided in these policies, and only for any of the following causes:

(1) Demonstrated incompetence or dishonesty in the performance of professional duties.

(2) Personal conduct which substantially impairs the individual's fulfillment of institutional responsibilities.

(3) Insubordination by refusal to abide by legitimate reasonable directions of the administration or of the Board of Regents.

(4) Physical or mental disability making the faculty member unable, within a reasonable degree of medical certainty and by reasonably determined medical opinion, to perform assigned duties.

(5) Substantial and manifest neglect of duty.

\* \* \*

C. Notice of Dismissal For Cause: The president of the institution shall institute proceedings by giving the faculty member a written dismissal notice by registered or certified mail, which dismissal notice shall contain:

(1) Full and complete statements of the charge or charges relied upon,

(2) a copy of any pertinent rules and regulations governing the faculty member's procedural rights, and

(3) a statement that the faculty member has the right to elect to have the hearing conducted either by the Hearing Committee or a Hearing Examiner.

D. Answer and Service: Within 30 days from the date of the receipt of the dismissal notice the faculty member may file a written answer to the charges. The period for filing the answer may be extended by the president for good cause. The answer shall also contain a request for either a hearing by the Hearing Committee or Hearing Examiner. If the faculty member fails to file a timely answer, the notice of dismissal shall be final.

*Hearings*:

In order to assure a fair and impartial hearing, a dismissed faculty member shall receive a written notice of hearing as hereinafter provided and may avail himself of either one of the following two hearing procedures:

A. Hearing Committee: Each year the faculty of each institution shall elect thirteen faculty members representative of the various ranks in the institution who shall be known as the Hearing Panel. In the event of a vacancy for any cause the faculty shall fill the vacancy.

If the request is for a hearing before the Hearing Committee:

(1) The president shall furnish the faculty member, in writing, a list of nine of the thirteen faculty members of the Hearing Panel as herein set forth, with instructions to strike four names and return the list to the president within five working days. If for any reason the faculty member fails to strike, the president shall within five working days strike a sufficient number to reduce the members to five which shall constitute the Hearing Committee.

(2) The president shall promptly notify, in writing, the five members of their selection as the Hearing Committee, and of their need to select from their membership a chairperson, and shall designate a time and place for their meetings to make such selection and to set a date for hearing the charge or charges.

(3) The chairperson shall give notice by certified mail to the concerned parties of the time and place for hearing the charge or charges which time shall be not less than ten days nor more than twenty days from the date of the notice thereof.

B. Hearing Examiner: If the request is for a hearing before a Hearing Examiner:

(1) The president shall so notify the Board of Regents, which shall appoint a duly qualified disinterested attorney at law as a Hearing Examiner and shall submit the name and address of such Hearing Examiner to the president and to the dismissed faculty member.

(2) The Hearing Examiner shall determine the time and place for a hearing to be held and shall give notice by certified mail to the concerned parties. Such hearing date shall be not less than ten days nor more then twenty days from the date of appointment of the Hearing Examiner.

Hardway's letter enumerated three causes for the dismissal of Dr. Clarke and listed fifteen reasons in support of the causes. Some of the reasons listed in support of the charges seem duplicitous but apparently were included because they can relate to more than one charge. President Hardway's letter also included a copy of the Bulletin and informed Dr. Clarke that he had 30 days within which he could respond to the charges.

C. Hearing shall be Conducted as Follows:

(1) The Committee or the Examiner will hear such proof of facts as may be deemed proper and reasonable and make such investigation and enter such recommendations as the facts justify and the circumstances may require.

(2) The hearing will be conducted with as little delay as possible.

(3) The faculty member shall have the right to have an advisor, but such advisor shall not be a person other than a member of the faculty or staff of the institution, unless specifically permitted by name by the Committee or the Examiner.

(4) Witnesses will be examined under oath in the manner and form and in the order designated by the Committee or the Examiner.

(5) Formal court rules of evidence shall not apply in such hearings.

(6) Testimony shall be recorded, and a transcript thereof shall be prepared.

(7) A copy of the transcript of the testimony together with copies of the exhibits shall be furnished to the faculty member, at no charge, upon his request.

(8) As soon as practical after the hearing the Commitee or Examiner shall deliver to the president a copy of the record of the hearing with the recommendation of the Committee or Examiner and shall provide a copy of the recommendation to the faculty member. The president shall, within twenty days after receiving the record and recommendation, issue a decision in writing to the faculty member by certified mail, and such decision shall be final unless the faculty member institutes an appeal to the Board of Regents under the procedure set forth hereinafter.

D. Amendments: Technical forms and allegations in pleadings are not required to be observed and amendments or supplemental statements may be made and filed at the discretion of the Hearing Committee or the Hearing Examiner.

*Appeal to the Board of Regents:*

A. An appeal as of right from the final decision of the president of the university or college may be taken by the faculty member by filing a written notice of intent to appeal with the Board of Regents within 10 days after receiving the final written decision of the president.

Dr. Clarke filed a timely response to the charges either by denial or by indicating that the charges failed to state proper grounds for dismissal and at that time raised the issue of defective notice, which is one of his principal assignments of error here. He requested a hearing before a hearing examiner in accordance with the options set out in the Bulletin, and on May 18, 1978, the Board of Regents appointed an attorney to act as hearing examiner. Dr. Clarke was dismissed from his post on May 29, 1978, less than two weeks before his scheduled hearing on June 7, 1978. At the two-day hearing, sixteen witnesses testified, including Dr. Clarke. Both parties were represented by counsel and made informal use of evidentiary rules. The 324-page transcript of the hearing was not completed until November 9, 1978, and when it was reviewed by counsel, numerous errors and inaccuracies were noted. By agreement of the parties, both counsel revised the record and had it retyped. It was delivered to the hearing examiner on January 17, 1979. Counsel also provided the hearing examiner with memoranda summarizing their views of the evidence.

On February 16, 1979, the hearing examiner filed a seven-page recommendation which found that President Hardway dismissed Dr. Clarke pursuant to the procedures listed in the Bulletin and that the dismissal was for cause. Citing only the impressive testimony of other faculty members testifying in support of the firing, the hearing examiner did not reveal the factual basis for his recommendation nor did he designate the charges which he

---

B. Within 30 days after filing the notice of intent to appeal, a petition shall be filed with the Board of Regents containing a statement of the reasons why the final decision of the president is in error together with a complete record of the proceedings.

C. Within 60 days after receipt of the appeal, the Board of Regents shall consider the appeal on the record submitted and may take such action as it deems reasonable and proper in all the circumstances and in answer to all of its responsibilities under the law.

D. Time is of the essence, and in the event the faculty member fails to file the notice of intent to appeal and the petition of appeal as required in provisions "A" and "B" of this section, the decision of the president shall be final.

found were supported by the evidence. Dr. Clarke contends that the failure of the hearing examiner to specify his findings on the record rendered illusory his right of review.

On March 2, 1979, President Hardway, pursuant to the Bulletin, informed Dr. Clarke in writing that he was adopting the findings of the hearing examiner and affirming the dismissal. Dr. Clarke requested and was granted an appeal before the Board of Regents. The Board, by resolution dated April 6, 1979, affirmed President Hardway's dismissal of Dr. Clarke, finding that due process was accorded Dr. Clarke and that his dismissal was not arbitrary or capricious. After reviewing the record and the pleadings in the case, the circuit court affirmed the Board of Regents' resolution.

While this Court has never before had occasion to address the question of what procedural safeguards are required by due process[2] when dismissing a tenured professor, we have

---

[2] Some observations concerning the concept of due process as it was initially conceived and the present state of that constitutional right seem appropriate. Our Court stated early on that due process, as provided for in Article III, Section 10 of our state constitution, meant "a law which hears before it condemns; which proceeds upon enquiry and renders judgment only after trial." *Peerce v. Kitzmiller,* 19 W. Va. 564, (1882) *citing* Cooley, *Constitutional Limitations* 352, *quoting* Daniel Webster. This very literal reading of Article III, Section 10 pays proper deference to the language of that section which requires "due process of law *and* the judgment of [one's] peers." (Emphasis added.) A few years after *Peerce,* however, the Court had the opportunity to discuss the question of whether the language of that provision really means what it says. Relying on constructions of English law, the Court read the language *"and* the judgment of his peers" to mean *"or* the judgment of his peers" (emphasis added) and labeled the insertion of the word "and" instead of the word "or" to be "a mere clerical error." *Jelly v. Dils,* 27 W. Va. 267, 275 (1885). *Jelly* undoubtedly represents the original sin of constitutional equivocation. Any construction taken from English law is obviously devoid of any sensitivity to our owm revolutionary history. As Justice Harshbarger (now Chief Justice) so cogently observed: "Is there really much sanctity in English law as it existed at the very time we as a people were shooting Englishmen because we were distressed by the way their government was denying us civil rights?" *Markey v. Wachtel,* 164 W. Va. 45, 264 S.E.2d 437, 449 (1979) (Harshbarger, J. dissenting; McGraw, J. joining in the dissent). More importantly, there is no rational justification for resorting to a

discussed on several occasions the procedural safeguards required when the state seeks to deprive one of an interest it has bestowed upon him. *State ex rel. McLendon v. Morton,* 162 W. Va. 431, 249 S.E.2d 919 (1978); *Waite v. Civil Service Commission,* 161 W. Va. 154, 241 S.E.2d 164 (1978); *Snyder v. Civil Service Commission,* 160 W. Va. 762, 238 S.E.2d 842 (1977); *Fox v. Board of Education of Doddridge County,* 160 W. Va. 668, 236 S.E.2d 243 (1977); *North v. West Virginia Board of Regents,* 160 W. Va. 248, 233 S.E.2d 411 (1977).

The threshold question in any inquiry into a claim that an individual has been denied procedural due process is whether the interest asserted by the individual rises to the level of a "property" or "liberty" interest protected by Article III, Section 10 of our constitution. *Waite, supra.*

---

"construction" of the language of Article III, Section 10. This Court has recently noted, in the context of statutory construction, that while there may be occasions when a court may substitute "or" for "and" when necessary to give effect to clear legislative intent, such a construction will not obtain when the language of the provision is clear. *Cogan v. City of Wheeling,* (No. 14108 Feb. 10, 1981).

The upshot of this convoluted constitutional analysis is that due process has become so riddled with equivocations propounded by result-oriented courts that a clear contemporary definition of it is virtually impossible. Instead, we meander aimlessly through ritual recitations of the right, through this approach and that, balancing this interest against that one, to the point that no man can predict the rights to which he is entitled. The concept of due process has been manipulated so far afield from the plain language of the constitution that we can now deprive a person of his liberty without a judgment of peers. *Markey, supra.* Jury trials are frowned upon because it is "troublesome to empanel juries", *Markey, supra,* at 449 (Harshbarger J. dissenting) and because our expansive notions of property and liberty interests protected by due process are such that "a jury trial would be required in virtually all administrative hearings if Article III, Section 10 were taken literally." *Markey, supra* at 441. While we freely endow our citizens with property and liberty interests, we take away the constitutional protections designed to safeguard those interests in the name of judicial economy. One wonders if we would not serve the populace better by simply following the constitution as it was written rather than by applying interpretations to words which, by themselves, stand as clear, terse statements of the foundations of freedom. Nevertheless, we must evaluate this case under our current standards.

This question is easily decided in the instant case, as both sides agree that under *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *State ex rel. McLendon v. Morton, supra; Waite v. Civil Service Commission, supra;* and *North v. West Virginia Board of Regents, supra,* Dr. Clarke has both property and liberty interests warranting due process protection. Having satisfied the initial question of Dr. Clarke's entitlement to due process protection, our inquiry becomes what procedural due process is constitutionally required.

In *North v. West Virginia Board of Regents, supra,* we said that before a *student* can be expelled from a state-supported university, he is entitled to a "formal written notice of charges; sufficient opportunity to prepare to rebut the charges; opportunity to have retained counsel at any hearings on the charges, to confront his accusers, and to present evidence on his own behalf; an unbiased hearing tribunal; and an adequate record of the proceedings." Syl. pt. 3 (in part), 233 S.E.2d 411. The *North* criteria, however, are not rigid standards. They represent only the touchstones by which we test the adequacy of procedures in a particular case. Outside of the criminal field, due process is a flexible concept which requires courts to balance competing interests in determining the protection to be accorded one facing a deprivation of rights. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *North, supra. See also Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). This court has embraced an approach which effectively serves to balance these interests.

In *Waite, supra,* we summarized some broad principles relating to the scope of due process procedures that would be made available in given cases.

> "The extent of due process protection affordable for a property interest requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of a property

interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the functions involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Syl. pt. 5, *Waite, supra. See also, Mathews v. Eldridge, supra; State ex rel. McLendon v. Morton, supra.*

We have already noted that the interests asserted by Dr. Clarke are property and liberty interests subject to due process protection. In applying the first factor enunciated in *Waite*, it is apparent that the protectable interests asserted by Dr. Clarke are of a very substantial nature. Unlike *Waite*, which involved a temporary suspension of a civil service classified employee, the instant case involves "[t]enure [which] once acquired is a substantial right. It ensures that the teacher cannot be dismissed except for the defined reasons which are set out in the Bulletin and then *not until a full due process hearing has been held"*. *State ex rel. McLendon v. Morton, supra,* at 926, (emphasis added). Realizing that Dr. Clarke has what we have termed "a substantial property interest", *McLendon, supra,* we must determine if the procedural safeguards imposed here were adequate to protect that interest.

## I

The appellant's first contention is that he was denied due process in that the notice of his dismissal was inadequate to apprise him fully of the charges against him. He forcefully argues that adequate notice is an essential element in any standard of due process. Relying on *North v. West Virginia Board of Regents, supra,* where we said at syllabus point 2, in part, that "the more valuable the right sought to be deprived, the more safeguards will be interposed", Dr. Clarke contends that since the rights of which he is being deprived are substantial, the notice to him must meet strict constitutional muster. Although the notice of dismissal sent to Dr. Clarke contains what appear to be fairly specific allegations of acts which, if found to be true, would justify removal under the provisions of the

Bulletin, he maintains that the notice of dismissal lacked the requisite specifics laid out in *Snyder v. Civil Service Commission*, 160 W. Va. 762, 238 S.E.2d 842 (1977), to meet the high standards required when a substantial property interest is in question. We said in syllabus points 4 and 5 of *Snyder, supra,* that

> [w]here an act of misconduct is asserted, in a notice of dismissal, it should be identified by date, specific or approximate, unless the characteristics are so singular that there is no reasonable doubt when it occured. If an act of misconduct involves persons or property, these must be identified to the extent that the accused employee will have no reasonable doubt as to their identity.

*Snyder* involved the dismissal of a civil service employee for falsifying a travel expense report. The notice to the employee did not indicate which particular travel expense report had been falsified. The notice was defective because it alleged *an act* of misconduct but failed to identify the act. *Snyder*, however, is distinguishable from the instant case because the alleged misconduct attributed to Dr. Clarke pertains more to a continuing course of conduct, and, as such, is less susceptible to being expressly detailed. For example, the letter of dismissal recites that Dr. Clarke refused "to spend a sufficient amount of time on campus to meet the responsibilities of [his] position." Such an allegation is hardly susceptible to being particularized, unless President Hardway meticulously clocks Dr. Clarke's hours over the course of a year.

The dismissal letter, however, does contain allegations of specific acts which are not detailed by dates or names. For example, one charge is that Dr. Clarke refused to accept a revised 1977-78 teaching schedule except under protest and that he also failed to familiarize himself with the course material for the revised teaching assignment. This charge, while it does not detail the course with which Dr. Clarke allegedly refused to become familiar, is so singular in nature that there can be no doubt as to the activity in question. While there is no question that supplying dates and names, where relevant to specific acts of misconduct,

is preferable and not burdensome, where the acts alleged are so singular as to leave no doubt about the charge, the *Snyder* test is satisfied.[3]

Moreover, while Dr. Clarke protested in his answer that the charges set forth in the dimissal letter were vague, he addressed every ground for dismissal either by denial or answer. The cold record of his testimony fairly reflects that he was in fact aware of the acts of alleged misconduct which gave rise to his dismissal and was not surprised by any of the charges. When we apply the second and third factors of the *Waite* formula, we cannot say that the dismissal notice was so deficient as to deny Dr. Clarke due process of law. The burden of documenting in the notice all the particulars of the alleged misconduct over a period of time would greatly burden the administration and, at least in this case, would provide no increased procedural protection. It appears from the record that Dr. Clarke knew the substance of the charges against him and that is what the law requires. As we stated in *Snyder, supra,* "[u]ltimately, the sufficiency of the notice depends not on the rote following of some standard, but on whether the employee was informed with reasonable certainty and precision of the cause of his removal." 238 S.E.2d at 844.

While we do not find the notice of dismissal so inadequate as to violate due process, we do note that the format and clarity of the dismissal letter are far from exemplary and but for the facts of this case it would have failed to meet minimum procedural due process standards. Ideally, the sufficiency of the notice should appear on its face. In this

---

[3] We have been directed to several cases from other courts dealing with the exactitude of required notice. In one case, *Weber v. Buncombe County Board of Education,* 46 N.C.App. 714, 266 S.E.2d 42 (1980), the court held sufficient a letter of dismissal quite similar to the letter in the instant case. While that case stated that the notice was made more specific through a bifurcated hearing process, the court did not hold that the validity of the notice turned on the existence of the bifurcated proceedings. In *Downing v. Williams,* 624 F.2d 612 (5th Cir. 1980), the court held deficient a letter of dismissal which stated that the employee was being discharged for insubordination. The letter specified no particular acts of misconduct. Clearly the notice to Dr. Clarke is not deficient as was the notice in *Downing.*

close case we have been forced to exhaustively review the transcript of testimony and our prior decisions on notice in order to reach a result. Such a review on the part of a court should not be necessary. Compliance with the notice requirements of due process should be a matter of course, not a matter of protracted litigation.

## II

Dr. Clarke's second substantial contention involves the hearing examiner's report. He argues that his right to review was rendered illusory by virtue of the failure of the hearing examiner to state the reasons for his recommendations and the evidence upon which he relied. The hearing examiner's seven-page report consists mostly of a recitation of the facts and the procedure of the case, along with relevant excerpts from the Bulletin. It is not until page 6 that the report begins an evaluation of the evidence and charges. The substance of the analysis is that Dr. Clarke was discharged for cause, based upon "the evidence which came from other tenured faculty members . . . [which] was particulary impressive." There is no indication in the hearing examiner's report as to which of the charges against Dr. Clarke were sustained or the specific evidence upon which the hearing examiner relied in reaching his conclusion that Dr. Clarke's dismissal was justified.

The hearing examiner is not required by statute to make written findings of fact and conclusions of law,[4] nor does the Bulletin specifically require him to state on the record the reasons for his decision or to specify the evidence which supports those reasons. The Bulletin does, however, require the hearing examiner to "enter such recommendations *as the facts justify and the circumstances may require.*" (emphasis added). Clearly the Bulletin contemplates that the hearing examiner will make a reasoned determination which is supported by the evidence adduced at the hearing. At the very least, the hearing examiner should make some sort of findings on the record and

---

[4] Proceedings of the Board of Regents are exempt from the provisions of our Administrative Procedures Act. W. Va. Code § 29A-1-2 (1980 Replacement Vol.).

indicate the evidence supporting those findings in order to demonstrate that he has fulfilled his obligations as a fact finder and has not acted arbitrarily and capriciously in reaching his conclusions. "[T]he decision maker should state the reasons for his determination and indicate the evidence he relied on, (citations omitted) though his statements need not amount to a full opinion or even formal findings of fact and conclusions of law." *Goldberg v. Kelly*, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287, 301 (1970).

The need for an adequate statement of the hearing examiner's reasons for his determination and the evidence supporting them is obvious. Our function as a reviewing court is to review the record to determine if the evidence adduced at the hearing supports the findings of the hearing examiner and whether his conclusions follow from those findings. We must rely on the facts and logic upon which the hearing examiner ruled, *Cf. Johnson v. Branch*, 364 F.2d 177 (4th cir. 1966), *cert. denied* 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967), and determine whether he erroneously applied them in reaching his final determination. If the record of the administrative proceeding below does not reveal those facts which were determinative of the ruling or the logic behind the ruling, we are powerless to review the administrative action. We are thrust into the position of a trier of fact and are asked to substitute our judgment for that of the hearing examiner. That we cannot do.

Equally important is the burden placed on the individual seeking review of the administrative action. Where the hearing examiner fails to make adequate findings on the record to support his conclusions, the appellant cannot assert his grounds for review. He cannot allege error with particularity because he is unable to determine where the error was committed. Where, as here, the proceeding involves more than one ground for dismissal, the party seeking review is unable to discuss which of those charges the hearing examiner found to be supported by the evidence. The failure of the hearing examiner to state on the record adequate reasons for his determination and the evidence he relied upon infringes upon the right of the

party to have an effective and meaningful review of the administrative action taken against him in violation of due process. *See Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967); *Gardner v. Louisiana,* 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961).

The only statement made by the hearing examiner here was his conclusion that, in view of the "particularly impressive" testimony of other faculty members, Dr. Clarke's dismissal was for cause and pursuant to the procedures of the Board of Regents. This comment is nothing more than a conclusory pronouncement of the hearing examiner's decision on the ultimate question before him. Neither this Court nor Dr. Clarke is informed of the reasons for the conclusion nor the specific evidence relied on. A proper statement of the hearing examiner's reasons and a clear indication of the evidence on which he relied is especially important where they are myriad charges and hundreds of pages of testimony. In the report of findings and recommendations, a hearing examiner should list the specific charges found to be supported by the evidence adduced at the hearing and provide some reference to the evidence supporting those findings. In view of our discussion above, we conclude that the failure of the hearing examiner to state on the record the charges against Dr. Clarke which were found to be supported by the evidence constitutes reversible error.

Logically, the appropriate remedy for reversible due process procedural defects in an administrative proceeding is to remand the case to the appropriate tribunal with directions to order the administrative institution to remedy the defect. As stated in *Ferguson v. Thomas,* 430 F.2d 852 (5th Cir. 1970), an analogous federal case, a reviewing court should first determine if the procedures followed were proper. "If a procedural deficit appears, the matter should, at that point, be remanded to the institution for its compliance with minimum federal or supplementary academically created standards." 430 F.2d at 858. *See also, Woodbury v. McKinnon,* 447 F.2d 839 (5th Cir. 1971).

Remanding the cause with directions that the conclusions of the hearing examiner be supported with reasons

and evidence has been the relief employed in other circumstances involving inadequate findings by administrative agencies. It has been employed in the context of public utility rate-making proceedings. *See Monongahela Power Co. v. Public Service Commission,* (No. 14852, Feb. 10, 1981); *Cerro Cooper Products v. Illinois Commerce Commission,* 76 Ill.App.3d 230, 394 N.E.2d 1084 (1979); *United Telephone Co. of Indiana v. Public Service Commission,* 402 N.E.2d 1013 (Ind.App. 1980); *Gas Service Co. v. State Corporation Commission,* 4 Kan.App.2d 623, 609 P.2d 1157 (1980); *General Telephone Co. v. Public Utilities Commission,* 30 Ohio St. 2d 271, 59 Ohio Op. 338, 285 N.E.2d 34 (1972). This procedure has been used in cases involving the discharge of tenured faculty, *Bowing v. Board of Trustees of Green River Community College,* 11 Wash.App. 33, 521 P.2d 220 (1974), *modified,* 85 Wash. 300, 534 P.2d 1365 (1975), (the deciding body must either read the evidence or submit to the parties proposed findings), and in a student expulsion case, *French v. Bashful,* 303 F.Supp. 1333 (E.D.La. 1969).

Accordingly we remand the case to the circuit court with directions to order the hearing examiner to state the reasons for his recommendation and the evidence upon which he relied. The remand is not for the purpose of holding a new hearing. The hearing in this case was adequate. The report of the hearing examiner was not.

### III

A more troubling aspect of this case,[5] however, and one

---

[5] Dr. Clarke also alleges several other violations of due process which we need only briefly discuss. He contends that he should be entitled to have a hand in the selection of the the hearing examiner. The Policy Bulletin provides Dr. Clarke with the choice of having his hearing before a faculty committee, which he selects from a list of available faculty members supplied to him or he may choose to have his case heard by a hearing examiner. The Bulletin gives no indication that the faculty member will have any say in the selection of the examiner. We find nothing constitutionally improper about this procedure. As long as the hearing examiner is unbiased, due process is satisfied. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *North v. West Virginia Board of Regents,* 160 W. Va. 248, 233

718

which we must squarely confront, involves the question of whether the post-deprivation hearing afforded Dr. Clarke was adequate to protect his interests. He maintains that since he was removed from the payroll of the college some two weeks prior to the dismissal hearing and some ten months prior to the adoption of the hearing examiner's recommendations by President Hardway, he was deprived of substantial property and liberty interests without due process of law and in contravention of the Board's own policies.

We look first to Dr. Clarke's assertion that the Board violated its own policies in not affording him a hearing before his dismissal became final. The procedures set forth in the Bulletin indicate that the Board of Regents

S.E.2d 411 (1977). *See also, Owen v. Long County Board of Education,* 245 Ga. 647, 266 S.E.2d 461 (1980).

Dr. Clarke also contends that the delays in the proceeding violated due process. While we are dismayed to find that the proceedings in this case took almost a year, we are unable to find that Dr. Clarke was prejudiced by the delays. For the most part, the delays were caused by no fault of either party but were largely the result of the need for typing and amending the record.

Dr. Clarke further complains that the adversary nature of these particular proceedings violated his due process protection. Specifically, he objects to the use of evidentiary rules and to President Hardway's representation by counsel. A review of the record reveals that Dr. Clarke's counsel took advantage of several opportunities to object to certain testimony and, in fact, extensively exercised his right to cross-examine witnesses. This comports with the standards for such hearings set out in *Goldberg v. Kelly, supra;* and *North, supra. See also, Baxter v. Poe,* 42 N.C. App. 404, 257 S.E.2d 71 (1979). We fail to see how Dr. Clarke was prejudiced because President Hardway retained counsel in light of the fact that Dr. Clarke also had counsel. *See also, Frumkin v. Board of Trustees, Kent State,* 626 F.2d 19 (6th Cir. 1980) (the role of counsel). Another of Dr. Clarke's contentions centers around the role of President Hardway. He contends that as President Hardway initiated the charges, he should not be the party to act on the hearing officer's recommendations. In a similar situation, the court in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), found no defect in such a procedure and in the instant case we find no defect. *See also, Kendall v. Board of Education of Memphis City Schools,* 627 F.2d 1 (6th Cir. 1980) (where the court ruled that the *administrator* bringing the charges could not make the findings of fact.)

contemplated a pre-deprivation hearing in faculty dismissal cases. According to the Bulletin, the dismissal of a faculty member does not become final until all procedures, including the hearing, are exhausted or waived. Policy Bulletin, *Dismissal* § D; *Appeal* § D. Yet Dr. Clarke was removed from the college payroll two weeks before his dismissal hearing and nearly a year before President Hardway adopted the recommendations of the hearing examiner. Dr. Clark's dismissal was in fact, if not in name, final at that time and the dismissal hearing served only to permit him an opportunity to undo what had already been done.

We have held in a case involving teacher transfers that "[s]chool personnel regulations and laws are to be strictly construed in favor of the employee." Syl. pt. 1, *Morgan v. Pizzino*, 163 W.Va. 454, 256 S.E.2d 592 (1979). We have also held that "[a]n administrative body must abide by the remedies and procedures it properly establishes to conduct its affairs." Syl. pt. 1, *Powell v. Brown*, 160 W. Va. 723, 238 S.E.2d 220 (1977). The effective dismissal of a faculty member without a prior hearing as contemplated by the Board's own policies is unquestionably reversible error.

With regard to Dr. Clark's due process argument, we note that while the United States Supreme Court in earlier cases found a presumption against post-deprivation review hearings within the traditional balancing test approach, *see, e.g., Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Sniadach v. Family Finance Corporation*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), this presumption was effectively removed in later cases. *See e.g., Mitchell v. W. T. Grant Company*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), and *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). This Court has maintained a presumption that "due process must generally be given before the deprivation occurs unless a compelling public policy dictates otherwise." Syl. pt. 1, in part, *North v. West Virginia Board of Regents, supra.* We have also recognized, however, that the

State may be justified in forgoing a pre-deprivation hearing when the person presents a "continuing danger to persons or property or an ongoing threat of disrupting the academic process . . ." *North v. West Virginia Board of Regents, supra,* at 417, *citing Goss v. Lopez,* 419 U.S. 565, 582, 95 S.Ct. 729, 740, 42 L.Ed.2d 725, 739 (1975).

The interests asserted by Dr. Clarke as entitling him to a predeprivation hearing are his property interest in his salary and his liberty interest in pursuing his occupation. The Board of Regents asserts the compelling interest of the college in protecting its students from the disruptive effects of Dr. Clarke's alleged inability to cooperate with the administration and the faculty in the performance of his duties. The situation here is strikingly similar to that in *Peacock v. Board of Regents of University and State College of Arizona,* 510 F.2d 1324 (9th Cir.), *cert. denied* 422 U.S. 1049 (1975), where the appellant, a medical doctor involved in the administrative operation of the medical school, was suspended from his duties without a pre-deprivation hearing. Noting that the appellant in that case would suffer no financial loss by his suspension, the court held "that the potential threat to the administration of the medical school and the incidental threat of disruption of the functioning of the University Hospital was sufficient to outweigh appellant's limited interest in a pre-suspension hearing." 510 F.2d at 1329. *But see, Salyers v. Board of Governors of State Colleges and Universities of Illinois,* 69 Ill.App. 3d 356, 387 N.E.2d 1129 (1979), (pre-suspension notice of charges not required.)

We think that the compelling interest of the college in protecting the education of its students outweighs any temporary deprivation of Dr. Clarke's liberty interest in pursuing his occupation pending the outcome of the dismissal proceeding.[6] However, it is only in the most

---

[6] By acknowledging the propriety of post-deprivation review, we are not sanctioning the indiscriminate use of such a procedure. The government must clearly demonstrate on the record that it has a compelling interest which warrants suspension and it must follow that suspension with a prompt hearing which comports with due

compelling circumstances, clearly apparent on the record, that the law may deprive one of his property before providing due process, and we cannot sanction the college's action in removing Dr. Clarke from the payroll before any final determination as to whether his dismissal was justified. Mindful of our presumption favoring pre-deprivation review but also mindful of the compelling interest of the college in preventing harm to the students, we think that a suspension of Dr. Clarke with the pay to which tenure entitles him, pending the outcome of the dismissal proceedings, would provide the best protection for these competing interests. Dr. Clarke's property interest in his salary would be maintained and, at the same time, the college's interest in the education of its students would be protected. Whatever damage Dr. Clarke suffered as a result of a suspension would have been minimized by continuing his salary and requiring a prompt postsuspension hearing. We conclude, therefore, that the removal of Dr. Clarke from the college payroll prior to the dismissal hearing violated his due process rights and contravened the procedures required by the Bulletin.

The amount of any award of back pay is a matter which the circuit court will have to determine on remand, for we are unable here to make the necessary findings of fact to resolve such a question. *See, Burks v. McNeel,* 164 W. Va. 654, 264 S.E.2d 651 (1980). In *Skehan v. Board of Trustees of Bloomsburg State College,* 590 F.2d 470 (3rd Cir. 1978), *cert. denied* 444 U.S. 832 (1979), the court held that the lower court was correct in ordering a professor suspended without a prior hearing reinstated for purposes of the payroll but suspended from teaching because "the relief afforded by the district court presented an equitable accomodation of the interests of both the College and Dr. Skehan." 590 F.2d at 494. The court did hold that soverign immunity as construed by the Pennsylvania courts barred an otherwise justifiable award of back pay. Other courts have refused to allow sovereign immunity to bar an award of back pay under the theory that states vest courts with

process requirements. Absent such a showing, due process requires that the government accord individuals a pre-deprivation review.

jurisdiction to review decisions involving tenured faculty and thereby waive sovereign immunity. In *State ex rel. Chapdelaine v. Torrence*, 532 S.W.2d 542 (Tenn. 1976), the court ruled that an award of back pay is the proper remedy for an improper discharge. An award of back pay and reinstatement was held proper in *Van Arsdel v. Texas A & M University*, 628 F.2d 344 (5th Cir. 1980), where the court found that tenure provisions in a faculty handbook created a contract right. Any award of back pay must, of course, take into account mitigation of damages. *Burks v. McNeel, supra.*

In *Soni v. Board of Trustees of the University of Tennessee*, 376 F.Supp. 289 (E.D. Tenn. 1974), *aff'd* 513 F.2d 347 (1975), *cert. denied* 426 U.S. 919 (1976), the court held that "as plaintiff's termination . . . was without minimal due process and, therefore, wrongful, plaintiff is entitled to back pay from [the date of his discharge] . . . until the University completes a hearing complying with [due process]. 376 F.Supp. at 293. The rule in *Soni,* coupled with our pronouncements in *Burks, supra,* should control the back pay issue in this case on remand.

For the reasons set forth in this opinion, we conclude that the appellant, Dr. Paul A. Clarke, was deprived of substantial liberty and property interests without due process of law by virtue of the failure of the hearing examiner to state in his report adequate reasons for his determination that Dr. Clarke was dismissed from his tenured teaching position at Fairmont State College for cause and to indicate the evidence which supported his conclusions and by virtue of the failure of the college administration to afford him a hearing prior to his dismissal. Accordingly, we reverse the judgment of the Circuit Court of Kanawha County, which affirmed the decision of the Board of Regents, and we remand the case to that court for further proceedings consistent with the principles enunciated herein.

*Reversed and remanded with instructions.*

NEELY, JUSTICE, DISSENTING:

At the two-day hearing on the firing of Dr. Paul A. Clarke sixteen witnesses testified. Fifteen witnesses testified against Dr. Clarke; his own self-serving testimony was the only dissent to the unanimous conclusion that he deserved to be fired.

The hearing examiner, who was obviously persuaded by the overwhelming evidence against the professor, concluded that "the evidence which came from other tenured faculty members. . . was particularly impressive." As the majority opinion notes, the hearing examiner is not required by statute to make written findings of fact and conclusions of law, nor should his statements "amount to a full opinion or even formal findings of fact and conclusions of law." *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970). Yet in the face of the massive evidence against the professor, our Court has required that a hearing examiner list specific charges and provide reference to the evidence, a procedural hurdle demanded neither by statute nor case law.

At its heart, this case stands for the proposition that a tenured professor cannot be fired unless the university follows a maze of technical regulations and precedures without a single slip. Our creation of an endless system of "Simple Simon" and "Mother May I" procedure has virtually removed the college president's primary method for ensuring competence among our college professors: the power to fire.

Certainly tenure protects professors against narrow political firings, but it is not intended to provide complete job security that permits an employee to do nothing but collect his check. At a time when we read everyday of the failures of our public education system, the continued employment of incompetent teachers should be eliminated. Undoubtedly today's majority decision will furtherdestroy the remaining morale among college professors and teachers who are dedicated to the profession of educating the young. As I have pointed out before, the schools should be run for the students.