No. 22-ICA-54 – *YMCA of Parkersburg v. West Virginia Department of Health and Human Resources*

**FILED**

**July 28, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

SCARR, JUDGE, concurring:

I concur in the majority's decision to reverse the August 3, 2022, order of the BOR on the grounds that it was clearly wrong, against the clear weight of the evidence, and arbitrary and capricious. I write separately to discuss another important issue raised by the record. Namely, whether DHHR violated YMCA's due process rights by issuing first strikes and suspending stabilization payments without providing YMCA with adequate notice and a meaningful opportunity to respond and to present its position.[1]

---

[1] During the hearing before the BOR below, much of the questioning concerned the fact that DHHR had acted without providing YMCA with adequate notice or an opportunity to present its position before its stabilization payments were suspended. In his closing statement to the BOR, counsel for YMCA argued that "these investigations were conducted totally without any input from the Y and . . . issuing a strike without hearing both sides of the story, to me, seems like we want to get [a] constitution or real due process issue." On appeal, YMCA has also stressed in its briefs how it was not given an opportunity to present its side of the story before approximately $250,000 worth of stabilization benefits were suspended. Due process concerns were also raised and discussed during oral argument. Even if this issue were not sufficiently raised by YMCA, however, we would be justified in addressing it as plain error, s*ee generally In re K.L.*, 233 W. Va. 547, 759 S.E.2d 778 (2014) (per curiam) (court sua sponte reviewed due process issue as plain error), or in the exercise of our discretion to address controlling constitutional issues where the factual record has been adequately developed for decision. *See* Syl. Pt. 2, *Louk v. Cormier*, 218 W. Va. 81, 622 S.E.2d 788 (2005); *Sluss v. McCuskey*, No. 18-0626, 2019 WL 5960252, at *3 n.10 (W. Va. Nov. 13, 2019) (memorandum decision) (addressing due process issue involving failure to provide evidentiary hearing where issue was not designated as assignment of error in petitioner's brief).

1

Article III, Section 10 of the West Virginia Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." The Fifth and Fourteenth Amendments to the United States Constitution contain similar guarantees.[2] "Due process of law, within the meaning of the State and Federal constitutional provisions, extends to actions of administrative officers and tribunals, as well as to the judicial branches of the governments." Syl. Pt. 2, *State ex rel. Ellis v. Kelly*, 145 W. Va. 70, 112 S.E.2d 641 (1960). Further,

> [w]hen due process applies, it must be determined what process is due and consideration of what procedures due process may require under a given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been impaired by government action.

Syl. Pt. 2, *Bone v. W. Va. Dep't of Corrs.*, 163 W. Va. 253, 255 S.E.2d 919 (1979).

Here, DHHR issued both YMCA facilities a first strike under the Subsidy Policy, and subsequently suspended further grant payments under the Stabilization Policy to both facilities for twelve months without providing notice or an opportunity to respond

---

[2] Although decisions interpreting the due process guarantees under the federal constitution are often useful in interpreting the comparable language of our state constitution, I note that the Court is free to interpret our state constitution in a way which affords more protection than its federal counterpart. *See Women's Health Ctr. of W. Va. v. Panepinto*, 191 W. Va. 436, 441–42, 446 S.E.2d 658, 663–64 (1993) ("Although our due process clause does not significantly differ in its terms from the language of the Fifth and Fourteenth amendments of the federal constitution, this court has determined repeatedly that the West Virginia Constitution's due process clause is more protective of individual rights than its federal counterpart.") (footnote omitted); *Oregon v. Hass*, 420 U.S. 714, 719 (1975) (recognizing that "a state is free as a matter of its own law" to provide greater protections than the federal constitution).

to or challenge these actions. YMCA's first opportunity to challenge any finding or action occurred after DHHR had already issued the "first strikes" under the subsidy program and after it had stopped federal stabilization payments without any communication with YMCA.

"[W]henever government action infringes upon a person's interest in life, liberty or property, due process requires the government to act within the bounds of procedures that are designed to insure that the government action is fair and based on reasonable standards." *Major v. DeFrench*, 169 W. Va. 241, 286 S.E.2d 688, 695 (1982).

In order to evaluate the constitutional claim in this case, we must conduct a two-step analysis:

> Initially, we determine whether appellant's interest rises to the level of a "liberty" or "property" interest. If the answer is no, the second step becomes unnecessary because appellant has no claim warranting constitutional protection. If, however, either a liberty or property interest is at stake, then we must weigh the competing interest of the appellant and the State agency to determine what procedural due process is constitutionally required.

*Waite v. Civ. Serv. Comm'n*, 161 W. Va. 154, 159, 241 S.E.2d 164, 167 (1977), *overruled on other grounds, W. Va. Dep't of Educ. v. McGraw*, 239 W. Va. 192, 800 S.E.2d 230 (2017).

Accordingly, the due process analysis begins by considering whether YMCA had a protected property interest in receiving child care stabilization payments under the American Rescue Act. "A 'property interest' includes not only the traditional notions of real and personal property, but also extends to those [government] benefits to which an individual may be deemed to have a legitimate claim of entitlement under existing rules or understandings." Syl. Pt. 3, *Waite v. Civil Serv. Comm'n*, 161 W. Va. at 154, 241 S.E.2d at 164.[3]

> To have a property interest, an individual must demonstrate more than an abstract need or desire for it. He must instead have a legitimate claim of entitlement to it under state or federal law. Additionally, the protected property interest is present only when the individual has a *reasonable* expectation of entitlement deriving from the independent source.

Syl. Pt. 6, *State ex rel. Anstey v. Davis*, 203 W. Va. 538, 509 S.E.2d 579 (1998); a*ccord* Syl. Pt. 3, *Collins v. City of Bridgeport*, 206 W. Va. 467, 525 S.E.2d 658 (1999). "A 'property interest' protected by due process must derive from private contract or state law, and must be more than a unilateral expectation of" a benefit. *Major v. DeFrench*, 169 W. Va. at 251, 286 S.E.2d at 695.

---

[3] Government benefits have frequently been held to constitute property interests protected by the Due Process Clauses of both the federal and state constitutions. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254 (1989) (welfare payments); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (social security disability benefits); *Caulder v. Durham Hous. Auth.*, 433 F.2d 998 (4th Cir. 1970) (public housing); *Wampler v. Workers' Comp. Div.*, 216 W. Va. 129, 142, 602 S.E.2d 805, 818 (2004) (per curiam) (workers' compensation benefits); Syl. Pt. 16, *Dadisman v. Moore*, 181 W. Va. 779, 384 S.E.2d 816 (1988) (public employee retirement pensions).

In this case, YMCA met the detailed qualifications[4] for eligibility for stabilization payments laid down by DHHR when YMCA applied for stabilization benefits. It had a reasonable expectation that it would continue to receive monthly stabilization benefits as long as it continued to meet those eligibility criteria. *Cf.* Syl. Pt. 1, *Tasker v. Mohn*, 165 W. Va. 55, 267 S.E.2d 183 (1980) ("Our parole statute… creates a reasonable expectation interest in parole to those prisoners meeting its objective criteria."); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) ("…the welfare recipients in *Goldberg v. Kelly*… had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them."). The Stabilization Payments Overview posted by DHHR on its website indicates that DHHR will pay stabilization benefits to all qualifying applicants subject to the continued availability of funding.

In fact, at one place in the Overview, DHHR states that "[t]he West Virginia Department of Health and Human Resources (DHHR) will begin releasing monthly stabilization payments, based on child tier quality, to **all** qualifying licensed and registered childcare providers." (emphasis added). The Overview goes on to say that "[b]eginning October 1, 2021, through September 30, 2023, DHHR will **automatically** process monthly

---

[4] See West Virginia Child Care Stabilization Payment Policy & Procedure Manual Section 2.1 ("Who is Eligible?"), Section 2.2 ("Conditions for Eligibility"), and Section 2.3 ("Providers Not Eligible"), Exhibit 1 to Petitioner's Brief. *See also* W. Va. DHHR, Announcing-West Virginia Child Care Stabilization Payments Overview: Stabilization Payments Overview, Exhibit 2 to Petitioner's Brief, which sets out the requirements for eligibility and states that: "Any child care provider in West Virginia who **meets the specified conditions** and that has a child care license or certificate of registration is eligible." (emphasis added).

stabilization payments for **all** eligible providers." (emphasis added). This language indicates that child care providers who satisfy DHHR's eligibility requirements will be awarded stabilization benefits, and continue to receive stabilization benefits, subject to continued funding. Accordingly, YMCA had a reasonable expectation of entitlement, and therefore a property interest subject to the protection of due process. *Cf. Robie v. Price*, No. 2:17-cv-03089, 2017 WL 3097529, at *4 (S.D. W. Va. July 20, 2017) (physicians have a property interest, protected by due process, in continued participation in Medicare program); *Bowen v. North Carolina*, 710 F.2d 1015 (4th Cir. 1983) (physicians have a property interest, protected by due process, in continued participation in the Medicaid program); *Cross v. United States*, 512 F.2d 1212, 1217 (4th Cir. 1975) (retailers have a property interest, protected by due process, in continued participation in federal food stamp program).[5]

---

[5] Child care providers participating in the stabilization program arguably have a stronger claim to entitlement than health care providers participating in the Medicare and Medicaid programs, because stabilization providers are considered to be "beneficiaries," *see* Office of Child Care, American Rescue Plan (ARP) Act Child Care Stabilization Funds Frequently Asked Questions (FAQs), https://www.acf.hhs.gov/sites/default/files... (August 2021) ("Child care stabilization subgrants included in the ARP Act are benefits to a child care provider and are considered payments made to beneficiaries of a federal program…), while Medicare and Medicaid providers are not. *Robie v. Price*, No. 2:17-cv-03089. 2017 WL 3097529, at *4 (S.D. W. Va. July 20, 2017) ("Since the intended beneficiaries of the Medicare program are the Medicare beneficiaries, not the physicians who provide services through Medicare, the private interest a physician has in continuing to bill to Medicare is often discounted by the courts.").

Having determined that YMCA had a protected interest in continuing to receive stabilization benefits, I proceed to the second step of our analysis: what process was required in this case.

> The extent of due process protection affordable for a property interest requires consideration of three distinct factors: first, the private interests that will be affected by the official action; second, the risk of an erroneous deprivation of a property interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Syl. Pt. 5, *Waite v. Civ. Serv. Comm'n*, 161 W. Va. at 154, 241 S.E.2d at 164; a*ccord* Syl. Pt. 1, *Clarke v. W. Va. Bd. of Regents*, 166 W. Va. 702, 279 S.E.2d 169 (1981). In this case, YMCA lost approximately a quarter of a million dollars when it needed it most, and the risk of error through the procedures used by DHHR was high.[6] I find no government interest sufficient to outweigh these factors.

Significantly, our jurisprudence has long recognized that "due process must generally be given **before** the deprivation occurs unless a compelling public policy dictates otherwise." Syl. Pt. 2 (in part), *North v. W. Va. Bd. of Regents*, 160 W. Va. 248, 233 S.E.2d

---

[6] DHHR's procedures might have been sufficient when a first strike resulted in nothing more than a warning, but when it decided that a first strike would disqualify a child care provider from continuing to receive potentially hundreds of thousands of dollars of stabilization payments, it needed to increase its procedural safeguards. As the Supreme Court of Appeals of West Virginia instructed in *North v. Bd. of Regents*, 160 W. Va. 248, 233 S.E.2d 411, 417 (1977), it is a basic principle of due process that "the more valuable the right sought to be deprived, the more safeguards will be interposed."

411 (1977) (emphasis added); *accord* Syl. Pt. 5, *Clarke,* 166 W. Va. at 702, 279 S.E.2d at 169; Syl. Pt. 5 (in part), *Orteza v. Monongalia Cnty. Gen. Hosp.*, 173 W. Va. 461, 318 S.E.2d 40 (1984); Syl. Pt. 2, *White v. Barril*, 210 W. Va. 320, 557 S.E.2d 374 (2001). In this case, there is no compelling state interest which weighs in favor of a post-termination hearing. On the other hand, there are compelling reasons why there should be a pre-termination hearing in cases such as this. Indeed, the State's interest in protecting the child care industry, particularly during a deadly pandemic, warrants a measured and deliberate consideration *before* suspending stabilization benefits to facilities which can safely and effectively provide child care services.[7]

Furthermore, "[a]llowing a [child care provider] to give [its] side of the story will ensure that all relevant facts are before the decision-maker before the decision to suspend is made." *Waite v. Civ. Serv. Comm'n*, 161 W. Va. at 165, 241 S.E.2d at 170. A more informed decision-maker is less likely to make bad decisions that suspend benefits which should be continued, harming child care providers and the public they serve, and perhaps resulting in costly and time-consuming litigation. I also note that the stabilization program was created to deal with a health care crisis requiring an immediate response to stabilize the child care industry. The funding was only available for a limited time, and the

---

[7] I particularly want to emphasize that the suspension of stabilization benefits in these matters was in no way related to the health and safety of the facilities in question, or their compliance with DHHR's licensing requirements. Nor was YMCA ever asked or directed to engage in any additional training, or to take any corrective actions whatsoever. In fact, YMCA continued to receive state subsidy payments when its federal stabilization benefits were suspended.

delay involved in litigation might result in a provider being vindicated after funding for stabilization payments had been exhausted.

The failure of DHHR to contact YMCA and give it an opportunity to respond to the parents' allegations is all the more concerning in this case, given the fact that DHHR conducted little or no investigation before deciding to issue first strikes, and thereby set in motion the process that would suspend $250,000 worth of stabilization payments at a time when child care providers such as YMCA were struggling to survive.[8]

The e-mail chain concerning the decision to issue a first strike for the Williamstown After School program gives me particular pause, because it shows that DHHR decided to issue a first strike and suspend stabilization payments within approximately half an hour of being contacted by a parent about an alleged expulsion, without even bothering to contact YMCA.[9] I am also troubled by what happened with

---

[8] It is difficult to overstate the seriousness of the threat posed to our child care industry by the COVID-19 pandemic. Members of Congress who spoke in favor of enacting The American Rescue Plan with its child care stabilization grants warned that the industry stood "on the brink of collapse" and that "a massive investment in our child care sector [was] absolutely critical to our COVID response." Pamela Wolf, *House News-Bill Approved to Stabilize Child Care Sector, Help Parents Return to Work Amid Pandemic*, Wolters Kluwer Employment Law Daily, (July 30, 2020) (accessible at 2020 WL 4361341).

[9] At 12:10 p.m. on April 5, 2022, Sarah James (a case manager with Choices) e-mailed Theresa Wascom (assistant director for Choices) to tell her that Ms. James had just gotten off the phone with a mother who said that her child had been expelled on February 14, 2022, for hitting a YMCA staffer in the face. At 12:31 p.m. on April 5, 2022, Ms. Wascom e-mailed Kevin McIllwain (a child care subsidy specialist with Choices) to inform

9

regard to the Parkersburg Child Care Center, where DHHR personnel testified that they decided that a child had been expelled, rather than suspended, based on an e-mail from a parent without investigating what YMCA had to say.[10]

him that DHHR had just been informed of an expulsion which had allegedly occurred on February 14, 2022, and to ask whether anything should be done. She noted that the mother had found a new provider for the child. At 12:42 p.m. on April 5, 2022, Mr. McIllwain responded by return e-mail that they needed to send a strike letter, and that a copy of the strike letter needed to be sent to Diana Gillespie. We know from other evidence in the record that Ms. Gillespie was the ECE employee who would have been responsible for sending a letter to YMCA informing it that its stabilization payments were being suspended. Thus, within approximately half an hour of being told that a child had allegedly been expelled, DHHR had decided to issue a first strike against the Williamston After Care Program and to secondarily suspend YMCA's stabilization payments for that program.

[10] During cross-examination below, the following exchanges occurred between Krystall Chambers (Choices's supervisor of family services at Choice's Parkersburg office) and counsel for YMCA:

> Mr. Bays: Okay. And when you investigated this, on your direct testimony, you didn't indicate that you talked to the YMCA for their side of the story. Did you do that?"
>
> Ms. Chambers: I don't think I did. I was just following what ECE instructed me to do over the circumstances.
>
> Mr. Bays: So, you never asked the YMCA about either [L.W] or [L.G.]… and their side of the story?
>
> Ms. Chambers: Well, their side of the story could've been given to me with a two week notification that they were going to stop caring for the child."
>
> Mr. Bays: You have reached a conclusion that the YMCA expelled or terminated services for these children and . . . all I'm asking you is if you reached that conclusion without investigating the Y's side of the story?
>
> Ms. Chambers: I reached the conclusion that we were not notified that the child could return two weeks ahead of time

10

It is undisputed that DHHR made no effort whatsoever, prior to suspending stabilization payments, to contact YMCA to verify that the child at the Williamstown After School program had been terminated, rather than suspended, or whether the child might have been terminated without the usual two week notice pursuant to the emergency exception for hitting a staffer. In response to questioning by DHHR's counsel at the hearing below, Ms. Wascom, the assistant director at Choices, testified as follows:

> Mr. Casteel: Okay. Did you reach out to the YMCA or anyone that worked there to find out what was going on with [L.G.] after you became aware that he had been expelled?
>
> Ms. Wascom: I did not. I followed the directive that I was given from ECE, which was to—
>
> Mr. Casteel: Okay.
>
> Ms. Wascom: --issue the strike letter.

The following exchange occurred during the cross-examination of Ms. Wascom by YMCA's counsel:

> Mr. Bays: Okay, Fair enough. And you acknowledge that you didn't make any investigation of the Y's side before issuing the strike. Did you not?
>
> Ms. Wascom: I did not. I followed the directive I was given.

---

> from both parents saying they were told that their child could not return.
>
> Mr. Bays: The simple question is, did you ask anybody at the Y what their side of the story was?
>
> Ms. Chambers: No. I did not ask . . . .

Thus, a year's worth of stabilization funding for the Williamstown After School program was apparently suspended on the basis of nothing more than a single telephone call by a parent who did not even contact anyone at Choices or DHHR until approximately seven weeks after her child was allegedly expelled. Similarly, stabilization payments for the Parkersburg facility were suspended without any input from or the opportunity to respond by YMCA.

In this case, YMCA should have been provided, at a minimum, with adequate notice of the first strikes, as well as written notices that its stabilization benefits were being suspended for two of its facilities, and the reasons for those suspensions, so that it could effectively challenge the strikes and suspensions before such suspensions were implemented.[11] In addition, given the high risk of error, the magnitude of benefits involved,

---

[11] As discussed above, no notices of any kind were given to YMCA concerning the suspension of stabilization payments. Regarding the first strike notices, the Notification of Provider Regulatory Status for YMCA's Parkersburg facility does not identify the child involved, or the date of the alleged termination. This form letter simply states that: "It is our understanding that YMCA-Parkersburg Child Care Center did not give a child a 2-week notification before expelling a child." The warning letter for YMCA's Williamstown After Care program is somewhat better, identifying the child in question, but does not state when the relevant interruption in service occurred. As this case demonstrates, several weeks may go by before an alleged termination is reported to Choices or DHHR, making it all the more important to identify when interruptions in service occurred. Moreover, in some cases, a child may be subject to more than one interruption in service. Accordingly, the written notice should include enough information that the provider can be reasonably certain of the child involved and the time when the allegedly wrongful interruption in service occurred.

and the importance of supporting and stabilizing the child care industry during the COVID-19 crisis, I believe that YMCA should have been given a pre-termination hearing where it could put on evidence and cross-examine any witnesses called by DHHR. *Cf.* Syl. Pt. 8, *Zaleski v. W. Va. Physicians' Mut. Ins. Co*., 220 W. Va. 311, 647 S.E.2d 747 (2007) (stating minimal due process requirements for physicians denied renewal of malpractice insurance by West Virginia Physicians' Mutual Insurance Company). Furthermore, it should have continued to receive stabilization funds (subject, of course, to their availability) until DHHR proved, by a preponderance of the evidence, that the provider was no longer eligible to receive them.[12]

The BOR erred in upholding DHHR's decision to terminate stabilization payments without providing YMCA with notice and a pre-termination opportunity to challenge the issuance of "first strikes" and the resulting suspension of stabilization payments. These procedural shortcomings resulted in a violation of due process under both the state and federal constitutions.

---

[12] Either Choices or ECE, if not both, should have conducted some sort of investigation into the parents' allegations before uncritically and automatically accepting them as accurate and suspending YMCA's stabilization benefits. In a case where the interested or affected party (in this case YMCA) is given proper, timely notice and an opportunity to respond to an allegation before suspension of government benefits are provided, the absence of a meaningful governmental investigation might not matter. But where all such procedural safeguards (investigation, adequate and timely notice, opportunity to respond and pre-suspension hearing) are absent, there can be little doubt that due process has been denied.

Accordingly, I concur in the majority's analysis, reasoning, and decision to reverse the August 3, 2022, order of the BOR on the grounds that it was clearly wrong, against the weight of the evidence, and arbitrary and capricious, but I would further find that DHHR violated YMCA's due process rights by issuing first strikes and suspending stabilization payments without first providing YMCA with adequate notice and a meaningful opportunity to respond before stabilization payments were suspended.